In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3085

NIPPONKOA INSURANCE COMPANY, LTD.,

*Plaintiff-Appellant,*

*v.*

ATLAS VAN LINES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:09-CV-168—**Richard L. Young**, *Chief Judge.*

ARGUED APRIL 5, 2012—DECIDED JULY 5, 2012

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* This case involves the application of the Carmack Amendment, 49 U.S.C. § 14706, to a set of complicated contractual arrangements among a shipper, a carrier, and two entities that facilitated the shipment. As is true in many contract cases that wind up in litigation, the fundamental question is who must ultimately bear the loss when multiple actors play a role in an arrangement. While we appreciate the efforts

made by both the parties and the district court to sort this out, we conclude that further proceedings are necessary. A final answer must await further development of the details of the shipping contract and the nature of the relationship among the four companies. Summary judgment was therefore inappropriate.

## I

Our account of the facts, as it must under Federal Rule of Civil Procedure 56, takes them in the light most favorable to the nonmoving party; nothing we say should be understood as resolving any factual disputes. Toshiba American Medical System (TAMS) is a medical device manufacturer; it markets its equipment to hospitals and physicians by displaying its product line at trade shows around the country. This case arose out of a shipment that was to go from California, TAMS's home state, to the 2008 trade show in Chicago of the Radiological Society of North America. TAMS hired Comtrans, Ltd., to coordinate that shipment, which fell within a special category of cargo known as an "Exhibit Shipment." Comtrans is essentially a middleman; it is not a licensed interstate motor carrier. It used its affiliate, Alternative Carrier Source, Inc. (ACS) to handle the arrangements for transportation. ACS retained Atlas Van Lines, Inc. (Atlas) to perform the actual shipment of TAMS's equipment. (We refer to this as the Shipment, as there is only one at issue in the case.) Unfortunately, the Atlas truck carrying the Shipment was involved in a serious accident, leaving TAMS with

more than $1 million in losses. Nipponkoa, TAMS's insurance company, brought this action on behalf of TAMS.

Atlas is an interstate motor carrier authorized by the Federal Motor Carrier Safety Administration to transport goods in interstate commerce. Cargo claims against it are thus subject to the Carmack Amendment, 49 U.S.C. § 14706. This statute provides that a carrier of property in interstate commerce is liable for "the actual loss or injury to the property caused by" the carrier. 49 U.S.C. § 14706(a)(1). A carrier may limit its liability, however, "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." *Id.* § 14706(c)(1)(A). The question in our case is whether Atlas limited its liability to TAMS consistently with the Carmack Amendment.

Atlas relies on two contracts executed in connection with the Shipment: (1) the contract it had in place with ACS at the time of the accident; and (2) the bill of lading delivered to Comtrans and signed by Comtrans's warehouse manager when Atlas picked up TAMS's shipment. Each of these, it asserts, independently limits Atlas's liability to TAMS to $0.60 per pound: Nipponkoa disputes Atlas's interpretation of the ACS-Atlas contract and the bill of lading, contending that neither contract applied to TAMS and that even if they did apply, they are not Carmack-compliant. The district court initially agreed with Nipponkoa and denied Atlas's

motion for summary judgment. At that time, the court found that there was a genuine issue of material fact whether TAMS agreed to allow Atlas to limit its liability for the shipment. Atlas came back with a motion to reconsider, however, and succeeded in changing the district court's mind. In the end, the court concluded that as a matter of law TAMS (and thus Nipponkoa) was compelled to accept the contract terms, including the limitation of liability, negotiated between the carrier and intermediaries like ACS and Comtrans. This appeal followed.

## II

### A

Our review of the district court's grant of summary judgment is *de novo*, *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011), and so we will move directly into the merits of the appeal. We apply the widely-accepted test established in our decision in *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987), to determine whether a carrier has properly limited its liability under the Carmack Amendment. See also *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1031 (7th Cir. 2000). In *Hughes*, we wrote that "[t]here are four steps a carrier must take to limit its liability under the Carmack Amendment: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission [ICC]; (2) obtain the shipper's agreement as to a choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and

(4) issue a receipt or bill of lading prior to moving the shipment." *Hughes*, 829 F.2d at 1415-16. Following the enactment of the Trucking Industry Regulatory Reform Act of 1994 and the ICC Termination Act of 1995, the first part of the *Hughes* test is no longer applicable. That is of no importance to the present case, however, because the only elements that are contested are the second and third.

Atlas argues that the ACS-Atlas contract governs this case and achieves a limitation of liability that is consistent with the Carmack Amendment. The relevant language from the ACS-Atlas contract states that the "[s]hipper acknowledges that the Tariff includes a choice of liability options." It also says that "[u]nless Shipper specifically requests different provisions with respect to any single shipment, Shipper releases all shipments transported under this Contract to Carrier with its maximum liability to be $0.60 per pound under Item 190 of the Tariff." Because TAMS or ACS did not declare a higher value, Atlas contends that its liability is limited to $0.60 per pound.

Atlas also asserts that its bill of lading reinforces this conclusion and is a second Carmack-compliant contract that also limited its liability to $0.60 per pound. A bill of lading serves as a contract. *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 457 (7th Cir. 1996). The bill of lading here states that the shipper has released the shipment to a value not exceeding either "[t]he maximum released rate set forth in the tariff for shipments on which the specified services are being

provided, which may be either $.60 per pound per article or $5.00 per pound" or "[t]he declared value for the property of $ _____." Comtrans left the line blank where it could have declared a higher value than $0.60 per pound. The bill of lading concludes by stating that if the declared amount "exceeds the maximum released rate in the tariff, Carrier shall obtain insurance in this amount on Shipper's behalf for the charges set forth in the tariff."

Putting aside for the moment the question whether either contract binds TAMS, because they are not contracts directly with TAMS (a point that we discuss below), we must examine the meaning of these provisions. On their face, they suggest that TAMS had a choice between accepting a $0.60 per pound limitation of liability or declaring a different value for the load, while also incorporating Atlas's tariff. Atlas's shipment rates and rules are contained in the Atlas Van Lines, Inc., Specialized Transportation Group Tariff ATVL 500. Unfortunately, this apparent clarity slips away when we look to the tariff, which is an ambiguous mess. Atlas directs our attention to Item 3035, which states:

> Rates apply on shipments released to a value not to exceed 60 cents per pound, per article. When shipment is released to a value exceeding 60 cents per pound, per article, or shipper declares a valuation on the entire shipment, rates herein apply plus charges in Item 190.

Thus instructed to turn to Item 190, we do so. We find that it is entitled Released Value (Valuation Charges) and

states that when a shipment is released to a value exceeding the maximum liability (in this case, presumably $0.60 per pound), Atlas will obtain third-party insurance "to cover all loss or damage to the property being shipped." Atlas charges the shipper "for the cost of this coverage" $4.50 per $1,000 for the total value declared, "subject to a minimum charge of $45.00." The immediate question before us is whether this additional rate quoted in Item 190 should be understood as a second option for a rate, or if it is merely something that sets out the cost of insurance. Although one might protest that insurance and rates are economic equivalents, they have not been treated that way in the transportation trade. Thus, a prominent transportation law treatise confirms that an offer to purchase third-party insurance does not qualify as an alternative choice of rates under the Carmack Amendment. Augello, FREIGHT CLAIMS IN PLAIN ENGLISH, Vol. I, § 8.8.20 (4th ed. 2008). Accepting that distinction, Atlas nonetheless protests that Item 190 establishes a second rate option. But its bill of lading seems to contradict that position. The bill of lading says that the $.60 per pound limitation on liability "is not insurance but a limit on Carrier's Liability" without making a comparable clarification in Item 190. Nothing that we can find in the evidence presently in the record clarifies whether the reference to a price of $4.50 per $1,000 of value declared is supposed to incorporate both an additional rate and insurance, or if it is exclusively the price of insurance.

The question is further complicated by the disagreement between the parties over whether TAMS's ship-

ment was an Exhibit Shipment. This is important because Item 190 includes an express exception for Exhibit Shipments, and there is substantial evidence indicating that this is what TAMS's shipment was. On the one hand, Wayne Curtis, Comtrans's CEO and President, testified that TAMS's shipment qualified as an Exhibit Shipment, but on the other hand, Curtis does not necessarily speak for Atlas. The relevant exception under Item 190 for Exhibit Shipments states that "[w]hen an exhibit shipment is released to a value exceeding the maximum liability . . . the Carrier shall provide a certificate of transit coverage for EXHIBITGUARD PROTECTION." That might seem straightforward, but again, it is not. The glaring problem for Atlas is that Atlas appears to have waived any argument that Exhibit Guard was Carmack-compliant. It did so through Bradley Beyer, its Claim Representative, who stated in an email to Nipponkoa's counsel that Exhibit Guard "is not subject to Carmack" because "it is actually insurance coverage that provides more protection to the shipper than a carrier is required under Carmack." Atlas responds to this evidence not by relying on Exhibit Guard, but instead by asserting that it gave Nipponkoa a list of exhibit shippers that have declared values in excess of $0.60 per pound *without* purchasing Exhibit Guard. We have no idea if this is so, or what exactly might have been given, because this evidence is not in the record. On the record before us, considering all the evidence we have reviewed, we conclude that there is a genuine issue of material fact whether Atlas offered TAMS "a reasonable opportunity to choose between two or more levels of liability." *Hughes*, 829 F.2d at 1415-16.

B

Nipponkoa argues that even if the Atlas tariff includes a choice of liability levels, neither the ACS-Atlas contract nor the bill of lading can govern this case because TAMS did not authorize ACS or Comtrans to sign shipment contracts on its behalf. Atlas responds by pointing to the Supreme Court's statement that "[w]hen an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 33 (2004); see also *Werner Enters., Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1324 (11th Cir. 2009) (concluding that "*Kirby*'s teaching is not limited to maritime law" because its analysis was based on a non-maritime case, *Great N. Ry. Co. v. O'Connor*, 232 U.S. 508 (1914)). The idea is that if A engages B to handle a shipment, among other things, A has delegated to B the choice between a lower price with a strict limitation of liability and a higher price without one, when B engages the services of Carrier C. We must therefore determine whether ACS or Comtrans served as an intermediary between TAMS and Atlas.

Once again, the record leaves a great deal to be desired. Here, the chain appears to go from TAMS to Comtrans to ACS to Atlas, but the facts pertaining to ACS's role—in particular whether it was functioning as the kind of intermediary to which the Supreme Court was referring in *Kirby*—are murky at best. According to Atlas, ACS is a freight broker that coordinates the

billing for Comtrans's vendors. Atlas represents that ACS served many roles for it, including that of financial intermediary between TAMS and Atlas. Atlas argues that the ACS-Atlas contract, which establishes the shipment terms and charges, was automatically triggered when ACS tendered TAMS's load to Atlas. Nipponkoa disputes Atlas's characterization of ACS's role in TAMS's trade show equipment shipments. It argues that ACS is merely Atlas's invoicing agent. To support that point, it notes that ACS is not registered as a freight broker, as required under 49 U.S.C. § 13901. Nipponkoa also cites Curtis's testimony to the effect that ACS takes care of Comtrans's invoicing. At oral argument, Atlas's counsel conceded that ACS and Atlas are owned by the same person and have the same mailing address. All we can say, in light of this, is that there are material disputed issues of fact on the question whether ACS was an entity independent from Atlas.

There may be somewhat greater support for Atlas's contention that Comtrans was an intermediary, but there are competing facts in the record on that point as well. TAMS hired Comtrans to coordinate its shipment to Chicago. Comtrans does not work exclusively with Atlas for all shipments. For example, Curtis testified that Comtrans works with air freight forwarders when air shipment is required. On the other hand, Curtis testified that Comtrans has an agency agreement with Atlas, and that Atlas is Comtrans's exclusive motor carrier. Under the agency agreement between the two entities, Comtrans is prohibited from entering into agency agreements

with other van lines. In fact, when Comtrans coordinates shipments for Atlas it works under Atlas's motor carrier number. Reviewing the evidence in the light most favorable to Nipponkoa, it is impossible to conclude as a matter of law that Comtrans was the kind of intermediary the Supreme Court had in mind in *Kirby*.

### III

In sum, even if the ACS-Atlas contract or the bill of lading provides a shipper with a choice of at least two levels of liability limitation, as *Hughes* requires, it is not clear that TAMS was bound by either contract. Further development of the record is necessary on both of the points we have identified. We therefore REVERSE the district court's grant of summary judgment in Atlas's favor and REMAND for further proceedings consistent with this opinion.