In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-2949 & 11-2967

KAWASAKI KISEN KAISHA, LTD., "K" LINE
AMERICA, INC., and UNION PACIFIC RAILROAD CO.,

*Plaintiffs-Appellants,*

*v.*

PLANO MOLDING CO.,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5675—**Harry D. Leinenweber**, *Judge.*

ARGUED MARCH 27, 2012—DECIDED AUGUST 29, 2012

Before FLAUM, WILLIAMS, and TINDER *Circuit Judges.*

FLAUM, *Circuit Judge.* On April 21, 2005, a Union
Pacific Railroad Co. train derailed in Oklahoma causing
extensive damage to both the railroad and the train's
cargo. Kawasaki Kisen Kaisha, Ltd. ("Kawasaki"), "K"
Line America, Inc. ("KAM") (collectively "K-Line"), and
Union Pacific Railroad Co. ("Union Pacific") (collectively

"appellants") blame Plano Molding Co. ("Plano") for the derailment, alleging Plano's steel injection molds were improperly packed, broke through their crate, and fell onto the track. Appellants now attempt to hold Plano liable for certain damages caused by the derailment, and seek indemnification for claims made against them by others who suffered losses in the accident. The district court granted Plano's motion for summary judgment. For the reasons set forth below, we reverse in part, affirm in part, and remand.

## I. Background

### A. Factual Background

Plano is an Illinois corporation that designs, manufactures, and sells plastic storage boxes, including tackle boxes. Identifying a need for new molds, Plano contacted CMT International, Inc. ("CMT"), a service provider that assists customers in the United States who wish to purchase products from Asia. After establishing Plano's mold specifications, CMT solicited bids from manufacturers in Taiwan and China. CMT presented Plano with the bids, and Plano selected Kunshan, a Chinese company, as its fabricator. The purchase orders ("POs") between CMT and Plano were for the "design, engineer, construct and supply" of two steel injection molds for use in Plano's Illinois factory.

It is undisputed that World, a non-vessel operating common carrier, was selected to coordinate the molds' transportation from China to the United States. The original terms of carriage were Free on Board Shanghai

("FOB Shanghai"). The term FOB indicates that the buyer takes ownership of the goods as soon as it passes over the rail of the ship. At World's suggestion, in a series of emails between Robb Yunger ("Yunger") of Plano, John Wember ("Wember") of World, and Amna Shah ("Shah") of CMT, the parties agreed to alter the delivery terms from FOB Shanghai to Delivered Duty Paid ("DDP"). Under DDP terms, the buyer does not take ownership until the goods arrive at its door. World representative Wember explained that ensuring the correct shipping terms was paramount because "if any-thing were to happen in transit you want your paper-work to reflect the true terms." Despite this discussion, the World bill of lading indicates that World was the consignee, consistent with FOB Shanghai shipping terms. Even so, CMT sent Plano an invoice dated July 14, 2005. This invoice charged Plano for the price of the molds, as well as shipping; CMT paid World directly for certain shipping costs, billing Plano later. CMT also paid the import duty and custom cleared service charge, and then invoiced Plano. These facts suggest that it was CMT that arranged the transportation with World under DDP terms.

As the freight forwarder, World contracted with THI Group LTD ("THI") and K-Line to ship the molds from China to Illinois. K-Line subcontracted the movement within the United States, from California to Illinois, to Union Pacific. K-Line supplied the shipping container to THI, and the molds were packed on-site at Kunshan. THI delivered the goods, packed in the container, to K-Line

in Shanghai. K-Line transported the molds from China to the United States, transferring the molds to a Union Pacific in California. The train derailed near Tyrone, Oklahoma on April 21, 2005, causing $2 million in damage to K-Line customers' cargo and separately costing Union Pacific about $2 million.

Plano received World's bill of lading via email on April 3, 2005, the day the molds were placed on the shipping vessel in Shanghai. The World bill of lading contained a "Himalaya clause" granting World's sub-contractors all warranties and indemnities defined in the World bill of lading. Relevant to this case, under the World bill of lading, when a container is packed by a party other than World, the "Merchant" warrants "that the stowage and seals of the containers are safe and proper and suitable for handling and carriage and *indemnifies* [World] for any injury, loss or damage caused by breach of this warranty." (emphasis added). Section 2.3 of the World bill of lading defines "Merchant" as "the Shipper, the Receiver, the Consignor, the Consignee, the Holder of this Bill of Lading and any person having a present or future interest in the Goods or any person acting on behalf of any of the above-mentioned persons."

K-Line issued its own bill of lading which contained a similar indemnification provision:

> If Goods received by Carrier are in Container(s) into which contents have been packed by or on behalf of Merchant, Merchant warrants that the stowage and securing of the contents of the Con-

tainer(s) and their closing and sealing are safe and also warrants that Container(s) and contents thereof are suitable for Carriage. . . . In the event of Merchant's breach of said warranties, Carrier shall not be responsible for any loss of or damage to or in connection with goods and Merchant shall be liable for loss of or damage to any property, or for personal injury . . . and shall defend, indemnify and hold Carrier harmless against all loss, damage, liability, cost or expense . . . .

The definition of "Merchant" in K-Line's bill of lading was similarly inclusive defining a "Merchant" as "shipper, consignor, consignee, owner and receiver of goods, and holder, and anyone acting on behalf of any such person."

### B. Procedural Background

Following the derailment of the Union Pacific train near Tyrone, Oklahoma, in April of 2005, eight complaints were filed in the Southern District of New York by owners of cargo damaged by the derailment, or their subrogated insurers, against Kawasaki, KAM, and Union Pacific. Union Pacific also sued Kawasaki and KAM for damage to the railroad property. Kawasaki and KAM filed third-party complaints against Plano, World Commerce Services LLC ("World") and CMT for indemnity or contribution. Union Pacific filed a third-party complaint against Plano and CMT on the same grounds. Four other cargo damage cases were filed in California.

The third-party complaints against CMT and Plano were dismissed by the district court in New York for lack of personal jurisdiction, and Kawasaki and KAM then filed an action in the Northern District of Illinois against Plano and CMT. The Illinois action and the eight New York actions were centralized for consolidated, pre-trial proceeding in the Southern District of New York. Union Pacific filed a complaint in intervention.

All cargo claims have settled, as have appellants' claims against World and CMT, leaving only the claims of Kawasaki, KAM, and Union Pacific against Plano. The Southern District of New York transferred the case to the Northern District of Illinois, where the district court granted Plano's motion for summary judgment. This appeal followed.

## II.  Discussion

We review de novo the district court's grant of summary judgment. *O'Leary v. Accretive Health*, 657 F.3d 625, 630 (7th Cir. 2011). Summary judgment is appropriate where the movant demonstrates that there exists no genuine dispute as to an issue of material fact, and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The court must review the record in the light most favorable to the non-moving party and construe all reasonable inferences in that party's favor. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). Here, we apply federal maritime law because jurisdiction exists under 28 U.S.C. § 1333. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24-25 (2004) (finding bills of lading involving

overseas shipment of goods to be maritime contracts even where the last leg of the journey was by rail).

Appellants unsuccessfully sought damages and indemnification from Plano in the district court, asserting theories grounded both in contract and tort. Though we conclude that appellants' negligence claims were properly rejected, we find unresolved questions of fact material to the determination of one of appellants' contract claims. Therefore, we affirm the district court as to the contract claim based on K-Line's bill of lading but reverse as to the contract claim based on World's bill of lading. We also affirm the district court's decision regarding the negligence claims. We remand for further proceedings consistent with this opinion.

### A. Contract Claims

Appellants assert that Plano is liable for injuries caused by the train derailment under both the K-Line and World bills of lading. Under both bills of lading, Plano could likely be considered a "Merchant" and thus subject to liability if it breached the warranty to safely and adequately package the molds it handed over for shipment. First, appellants argue that World was acting as Plano's agent under a non-traditional agency theory, and therefore legally bound Plano to the K-Line bill of lading. In the alternative, appellants argue that Plano is liable under K-Line's bill of lading because Plano accepted its terms through conduct. Finally, appellants contend that Plano contracted directly with World, and is therefore

bound to the World bill of lading, which contains explicit warranties for packaged cargo and applies to K-Line and Union Pacific through the Himalaya clause.

A bill of lading can serve many functions. Most fundamentally, it is an acknowledgment of the receipt for goods. *Cargill Ferrous Intern. v. Sea Phoenix MV*, 325 F.3d 695, 703 (5th Cir. 2003). But it can also be evidence of title, or more importantly, serve as evidence of a contract of carriage. *Id.* "The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pac. Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 342 (1982); *see also C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 478-79 (9th Cir. 2000). "Contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Kirby*, 543 U.S. at 31. The question here is whether Plano can be bound to the K-Line and World bills of lading as the purchaser of the molds.

### 1. K-Line Bill of Lading

Appellants first attempt to bind Plano to the K-Line bill of lading under a non-traditional agency theory. Under traditional approach, an agency relationship requires that a principal direct an agent to act for the principal's benefit, the agent to consent, and the principal to have the power to control the agent's actions. *United States v. Aldrige*, 642 F.3d 537, 541 (7th Cir. 2011). But as

the Supreme Court articulated in *Kirby*, maritime contracts for transport are often not susceptible to such a traditional analysis. 543 U.S. at 34. Instead, the Supreme Court set forth a modified test which nonetheless finds an agency relationship in narrow circumstances. *Id*. Here, appellants attempt to bind Plano to the K-Line bill of lading, contending that World acted as its agent under the *Kirby* approach. However, as we will explain, the non-traditional analysis is very limited in its application, and its employment here is inappropriate.

When a buyer or owner of goods needs to transport his items, the owner will often contract with a freight forwarder to assist in the shipment. Sometimes this forwarder is entrusted with those goods as a first-tier carrier, but decides to sub-contract the movement to another second-tier carrier. This was the case in *Great N. Ry. Co. v. O'Connor*, 232 U.S. 508, 514-15 (1914). There, the Court established that a first-tier carrier can enter into enforceable contracts with second-tier carriers without the express consent of the owner. *Id*. Specifically, the Court held that the agreement between the first- and second-tier carriers to put a ceiling on the value of owner's goods was enforceable against the owner, even though the owner had never agreed to the lower value. *Id*. This was because the second-tier carrier "had the right to assume that the [first-tier carrier] could agree upon the terms of the shipment." *Id*. The result, of course, was that when the owner's goods were damaged in transit, her recovery from the second-tier carrier was limited to the value negotiated by the first- and second-tier carriers. The Court relied on *Great N. Ry. Co.* in *Kirby*, which expanded on this principle. 543 U.S. at 34.

In *Kirby*, a cargo owner hired an intermediary freight forwarding company to facilitate the transport of his goods from Australia to the United States. *Id*. The intermediary then hired a shipping company to transport the goods, and the shipping company subcontracted the overland portion of the trip. *Id*. at 19. Following an overseas journey, the cargo was damaged while being carried by rail. *Id*. at 18. There, the intermediary had negotiated a liability limitation with the shipping company, which was also passed along to the subcontracting railroad. *Id.* at 32-33. The railroad argued that its liability to the cargo owner was capped by a limitation of liability negotiated by the upstream carrier; plaintiff cargo owner maintained that it was not bound by the limitation because it did not agree to those terms. *Id*. The Court sided with the railroad holding that an intermediary can bind "a cargo owner to the liability limitations it negotiates with downstream carriers. . . ." *Id*. at 34. In reaching this conclusion, the Court held that an intermediary can serve as the owner's agent for "a *single*, *limited* purpose: when [the intermediary] contracts with subsequent carriers for limitation on liability." *Id*.

An intermediary's authority to act as the cargo owner's agent is narrowly tailored; it would be unsustainable to recognize an intermediary as an agent for the cargo owner in "every sense" because of the potential to expose the owner to unauthorized liability. *Kirby*, 543 U.S. at 33. As the Supreme Court has recognized, "intermediaries, entrusted with goods, are 'agents' only in

their ability to contract for liability limitations with carriers downstream." *Id*. at 35.[1] As we recently explained:

> The idea is that if A engaged B to handle a shipment, among other things, A has delegated to B the choice between a lower price with a strict limitation of liability and a higher price without one, when B engages the services of Carrier C.

---

[1] Though appellants argue that the recent Supreme Court case of *Kawasaki v. Regal-Beloit*, 130 S.Ct. 2433, 2488 (2010), extends this principle, they misconstrue the import of that case. *Regal-Beloit* dealt with the same derailment at issue here, but the question before the Court differed significantly. There, the Court examined whether the venue provisions set forth in a through bill of lading, which dictated that the entire journey would be governed by the Carriage of Goods by Sea Act, would apply to the domestic part of the import's journey by a rail carrier, despite prohibitions or limitations in another federal statute, the Cermack Amendment. 130 S.Ct. at 2439. The Court answered in the affirmative, holding that the agreed upon forum-selection terms in the bill of lading bound the cargo owners. In so holding, the Court found that Cermack's provisions do not apply to a shipment originating overseas under a through bill of lading. *Id*. at 2446. Though the Court determined that the bill of lading bound the cargo owners, the facts in that case are distinct. There, the owners contracted directly with K-Line, raising no questions related to first- or second- tier carrier liability. *Id*. What we can take from *Regal-Beloit* is the Court's conclusion that where a cargo owner agrees to a bill of lading, liability and venue rules contained therein will be enforceable. *Id*. at 2448.

*Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, ___ F.3d ___, 2012 WL 2580120 (7th Cir. 2012). Though appellants urge us to classify World as Plano's agent under this non-traditional *Kirby* theory, thereby rendering Plano liable under the K-Line bill of lading, we must pause to consider whether the application of this non-traditional theory is appropriate. Upon review, we agree with the district court that it is not.

The Supreme Court has limited the assumption of an agency relationship between an intermediary and a shipper who contracts for the intermediary's services to a narrow circumstance: where an intermediary makes a contract for liability limitations with carriers downstream. *Kirby,* 543 U.S. at 35. While the non-traditional agency theory is intended to facilitate commerce, the Court has nonetheless cautioned against recognizing an inter-mediary as the cargo owner's agent for all purposes. *Id.* at 33; *In re M/V Rickmers Genoa Lit.*, 622 F. Supp. 2d 56, 73 n.23 (S.D.N.Y. 2009) ("If taken literally, the notion that con-signors and consignees can be assumed to be in a princi-pal/agent relationship would expose consignees to poten-tially limitless liability for the conduct and contracts of their consignors.").

Here appellants attempt to limit their own liability for damages caused by the train derailment by seeking reimbursement and damages from Plano.[2] In a broad sense, this goal is consistent with *Great Northern* and

---

[2] They ask that we hold Plano liable under the K-Line bill of lading, which contains a warranty and limitation of liability clause regarding goods packaged by someone other than the carrier.

*Kirby*, where the carriers sought to limit their liability to cargo owners in accordance with their negotiated bills of lading. Similarly, K-Line's warranty regarding crated cargo comports with the Supreme Court's concern for ease of commerce, and the practical need of a second-tier carrier to be able to trust and rely on agreements it forms with a first-tier carrier on behalf of, or in the interest of, a cargo owner. Though we recognize this congruence, we must acknowledge the very limited circumstances in which the Supreme Court has recognized the non-traditional agency relationship. The Court has employed this approach exclusively where a carrier and an intermediary negotiated a maximum value for the transported goods, absent consent from the goods' owner. In recognizing an agency relationship, the Court has protected the second-tier carrier by limiting its liability to the owner of goods damaged in transit to the value negotiated with the intermediary. In contrast, here appellants use the K-Line bill of lading as a sword to obtain indemnification and damages from Plano, rather than a shield to avoid liability. Appellants wish to hold Plano accountable as a "Merchant" that broke its warranty regarding the fitness of its goods for shipment. But, Plano was not a party to the K-Line bill of lading, nor did Plano actually load the molds into the crate. Moreover, as we will explain below, there is a question of fact regarding the actual role Plano played in obtaining World's services. Remember, Plano hired CMT to facilitate the purchase of the molds from China. We are unconvinced that the *Kirby* Court envisioned the result for which appellants advocate. Though World

was certainly authorized to arrange the molds' shipment from China to the United States, we doubt that it could make guarantees on behalf of Plano, which if breached, could subject Plano to substantial liability. Given the Supreme Court's restraint in recognizing non-traditional agency relationships, we are unwilling to find one here.

Appellants next argue that Plano is liable under the K-Line bill of lading because Plano accepted the bill's terms by its conduct throughout the transaction. Although a bill of lading is a contract between a shipper and a carrier, it can nonetheless bind a non-party buyer where there is consent to be bound. *Rickmers*, 622 F. Supp. 2d at 71. It is undisputed that Plano is not a party to the K-Line bill of lading, which names THI as the shipper and World as the consignee. Whether Plano can nonetheless be bound must be determined by looking to general principles of contract formation and interpretation.

A non-party buyer may accept the terms of the bill of lading where it files a lawsuit under the bill, and attempts to benefit from its terms. *Steel Warehouse Co. v. Abalone Shipping Ltd.*, 141 F.3d 234, 237 (5th Cir. 1998). Here, it is undisputed that Plano did not file a lawsuit under the K-Line bill of lading, so this theory of liability is foreclosed to appellants. Appellants note that Plano filed an insurance claim to recover the value of the damaged goods, but present no evidence that Plano in fact sought any benefits under the K-Line bill of lading in connection with its claim. Moreover, appellants' suggestion that Plano accepted the bill of lading by receiving

a "special rate" offered by K-Line for the transport is supported by no authority and is not relevant to this determination.

Acceptance may also be shown through an agency relationship between the shipper and the intermediary. *Rickmers*, 622 F. Supp. 2d at 72. As discussed above, the non-traditional agency analysis articulated in *Kirby* is not appropriate here. The use of traditional agency principles to bind consignees to bills of lading, however, was called into question by the Supreme Court. *Kirby*, 543 U.S. at 34. In *Kirby*, the Court stated that when considering whether an intermediary can bind a shipper to the terms of a carrier's bill of lading, "reliance on agency law is misplaced" because the traditional indicia of agency, a fiduciary relationship and control by the principal, are generally lacking in relationships between cargo owners and freight forwarders. *Id*. To the extent that this analysis is proper to determine whether the shipper accepted the terms of the bill of lading, we agree with the district court that World was not acting as Plano's agent. Under a traditional analysis, an agency relationship requires a manifestation by the principal to the agent that the agent may act on his account, consent by the agent to so act, and the power by the principal to control the agent's conduct regarding the entrusted matters. *Aldrige*, 642 F.3d at 541. Here, the agency test must fail because Plano did not have the power to control World. As we discuss below, the record is unclear regarding what role Plano played in engaging World. Moreover, Plano did not direct World as to which shipper to select, or how to conduct its business. Though

Plano had a relationship with K-Line, the record does not indicate that Plano demanded that World contract with K-Line, much less THI or Union Pacific. Appellants point to no fact in the record which convinces us that Plano had the ability to, or did, control World.

For the foregoing reasons, Plano cannot be held to the terms of the K-Line bill of lading.


### 2. The World Bill of Lading

Turning to appellants' final theory of contract liability, asserting that Plano is bound to the terms of the World bill of lading as a contracting party, we must consider Plano's role in obtaining World as the freight forwarder for the molds' transportation. Appellants argue that Plano was a party to the contract, and was therefore aware of and accepted the terms of the World bill of lading. Plano maintains that it was CMT that contracted with World, and that its role was limited to a mere uninvolved purchaser. The importance of this factual determination can be seen in *Rickmers*. In *Rickmers*, an injured carrier sought to hold a purchaser of goods liable under bills of lading asserting that the purchaser was the ultimate consignee of the goods and fit within the bills' definition of "Merchant." 622 F. Supp. 2d at 71. In rejecting the arguments of the carrier, the *Rickmers* court held that though the purchaser likely fell within the broad scope of the Merchant clause contained in the bills of lading, the purchaser was not a party to

either bill, nor did it ever consent to be bound.[3] *Id*. at 72-73. Though *Rickmers*, as a district court decision is not binding here, we nonetheless find its analysis persuasive. Plano similarly argues that it was removed from all shipping terms because CMT handled the transportation of the molds from China to the United States.

The district court found it undisputed that CMT, not Plano, "hired" World, and the court determined that CMT was not Plano's agent, but a broker that filled its order. Accordingly, Plano was not a party to the World bill of lading. The district court also concluded that Plano could not be bound by the World bill of lading because it did not negotiate its terms or seek benefits under it. Appellants, however, maintain that Plano contracted with World directly, or in the alternative, that there are facts sufficient to create a question of fact as to this issue. The resolution of this question is important

_____

[3] In *Rickmers*, the purchaser, ESM Group, bought SS-89, a desulphurizing reagent in steelmaking, from its wholly-owned subsidiary, ESMT. While en route on the high seas, the goods allegedly caused an explosion on board the transporting vessel. ESMT arranged for the SS-89 to be shipped to the United States. The carrier asserted a breach of contract claim against the buyer, ESM Group, who had no hand in arranging the transport. The court declined to find ESM Group liable to the carrier because it was not a party to the bill of lading, nor did it consent to be bound. *Id*. at 71. There, the bill of lading contained a provision stating that broadly defined "merchants" would indemnify the carrier against any claim or loss arising out of the carriage of dangerous goods.

because if Plano engaged World to handle the shipment on its own behalf, it could be found liable to K-Line and Union Pacific by the plain terms of the World bill of lading. Contrary to the conclusion of the district court, we find the evidence surrounding the Plano-CMT-World transaction murky at best, and conclude that conflicts in the record regarding this point create a material question of fact requiring remand.

There are several facts which weigh on the determination of Plano's relationship with World. It is undisputed that Plano selected World as its forwarder, and instructed CMT to contact World regarding the shipment. But evidence suggests that it was Plano, not CMT, that actually arranged the shipment with World. The record also indicates that it was Plano's obligation to arrange the molds' transportation. First, Samuel Wu of CMT testified that Plano shipped the molds to the United States "FOB Shanghai." Under that term, Plano, not CMT, was responsible for arranging shipment. Also consistent with this term, the World bill of lading listed Plano as the consignee. Wu confirmed in his deposition that Plano did arrange the molds' transportation. Plano executive Yunger similarly confirmed that when a mold is shipped FOB, the entity making the order arranges for the goods' transportation. He denies, however, that Plano had any role in arranging the shipment for the molds at issue. This assertion is contradicted by Wember of World who testified that CMT had no role in booking the shipment, and that World had no direct dealings with CMT; instead, he dealt directly with Yunger at Plano. Wember also testified that Yunger initially contacted

World regarding the molds' shipment and points to an email sent by Yunger to Wember, copying CMT representatives, where Yunger states "I want to ship the molds FCL in terms to shipper where FOB Shanghai we can use a 20-foot container. Please arrange shipping and billing with EnJinn, CMT and/or Plano same as last molds except these molds are from China."[4]

A series of emails sent between Yunger, Wember, and Shah raise questions regarding the true terms of the shipment. In one email, Yunger asked World to begin arranging the shipment under FOB terms. World then replied that the shipment should be made DDP and not FOB. The parties appear to agree to alter the delivery terms, with Wember emphasizing that correct shipping terms were paramount because "if anything were to happen in transit you want your paperwork to reflect the true terms." Despite these emails, the bill of lading reflects FOB shipping terms, listing World as the consignee. The shipping terms are significant in terms of ownership. Under an FOB arrangement, Plano would take ownership once the cargo goes over the rail of the ship. Under a DDP arrangement, Plano would only take ownership when the goods arrived at its door, and CMT was responsible for transporting the goods to Illinois.

Although the World bill of lading indicates that the goods were shipped FOB, Wember testified that this was an error. He claims that the true purchase terms between

---

[4] The shipping term FCL indicates that all cargo belongs to one consignee, a "full container load."

Plano and CMT were DDP, and that CMT, not Plano, should have been listed as the consignee on World's bill of lading; however, he admitted that no correction or change was ever made. Further complicating matters is that CMT sent Plano an invoice dated July 14, 2005. This invoice charged Plano for the price of the molds, as well as shipping; CMT paid World directly for certain shipping costs, billing Plano later. CMT also paid the import duty and custom cleared service charge, and then invoiced Plano. These facts suggest DDP shipping terms, whereby CMT, rather than Plano, would make the shipping arrangements.

On this record, we are unable to ascertain whether CMT or Plano arranged the molds' shipment with World. Without this determination, we cannot conclude whether or not Plano engaged World in a manner that would impose liability as a contracting party, and subject Plano to liability under the World bill of lading. As to this narrow issue, we reverse the district court's grant of summary judgment and remand for further consideration.

## B. Negligence Claims

Appellants assert that the train derailment was caused by the inadequate packing and bracing of Plano's molds. Accordingly, they maintain that Plano may be held liable for damages caused by the accident because it owed the carriers a duty to supply a properly packed container. Appellants seek to impose this duty on Plano arguing that: (1) it was on notice of the carrier's

inability or incompetence to properly pack goods; (2) it had "unique knowledge" of "inherent risks" presented by the molds and failed to warn of the foreseeable danger; (3) Plano exercised substantial control over the molds' shipment; and (4) Plano is liable for World's acts because World acted as Plano's agent. The district court disagreed and found no evidence to suggest that the parties who packed and shipped the container were unable to do so properly, or that Plano was aware of any risk inherent to shipping the molds. It also determined that Plano exercised no control over World or THI, and found no agency relationship. We affirm the district court's finding regarding negligence.

Under federal maritime law, buyers do not typically owe carriers and fellow cargo owners a duty of care. *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) ("[I]mposing liability on the purchaser of goods would be both unjustified and illogical."). This is because "[a]s between carrier, shipper, and consignee, the consignee would be least likely to possess the necessary knowledge to have avoided any difficulty arising from improper packaging." *Atkins Kroll & Co. v. Kedlloyd Line*, 210 F. Supp. 315, 317 (N.D. Cal. 1962). However, some courts have held that a different rule might obtain where the buyer had unique knowledge of the known risks associated with its product. *Rickmers*, 622 F.Supp.2d at 65. Further, a buyer might be subject to liability if it was on notice of some incompetence on the part of the shipper. *Id*. A duty may be found where harm is reasonably foreseeable. *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 766 (7th Cir. 2009). We focus,

then, on whether the derailment was reasonably foresee-able given Plano's decision to use World, or because of the inherent risk of shipping the molds. It was not.

First, we examine whether the record suggests that Plano was on notice that World was incapable of safely and effectively transporting the molds. As an initial matter, the record indicates that Kunshan loaded the molds into wooden crates, K-Line supplied a shipping container, and THI loaded the crates into the K-Line container. Plano did not actively participate in loading the molds. Moreover, Plano had no reason to question the competence of World, Kunshan, or THI. World had shipped molds to Plano twenty to thirty times previously—there is no evidence that Plano ever had any problems with World's performance, or that World's performance was ever negligent or defective in any way. Furthermore, there is nothing to hint at any prior knowledge of incompetence on the part of Kunshan or THI.

Next, we consider whether Plano had any unique knowledge regarding the risks inherent in transporting the molds. Appellants suggest that transporting the molds posed a heightened risk because of the "concentrated footprint" of the molds; the molds were small in size, compared to their weight. Given this footprint, Plano allegedly should have accounted for the weight distribution within the containers. Though appellants cite to several cases to show that Plano had a duty to warn, unlike those cases, the steel molds at issue here contained no inherent risk such as toxic contamination, explosion, or

spontaneous combustion. *Edwards v. California Chemical Co.*, 245 So.2d 259 (Fl. Ct. App. 1971) (shipment of Ortho Standard Lead Arsenate, a "highly toxic" product requiring users to "wear protective clothing and employ a respirator"); *Barney v. Burntsenbinder*, 64 Barb. 212 (1872) (cargo of highly explosive nitroglycerine). To the extent that appellants claim that the weight of the molds made them dangerous, the evidence does not support the conclusion that Plano had specific knowledge about the "weight of the steel molds and the risk of shipping [the] molds without the appropriate use of blocking, bracing, or load spreading material." The weight of the molds was fully disclosed on the face of both the World and K-Line bills of lading, and no party has questioned the accuracy of the weight as recorded on these documents. Though Plano did select the size of the container because it believed the combined weight of the molds did not exceed the container's capacity, nothing suggests that Plano was aware of any risk presented by the size of the container. Moreover, K-Line itself supplied the container. Finally, appellants agree that the weight of the molds was within the weight capacity of a properly maintained 20-foot K-Line container.

Appellants also maintain that the derailment that occurred in Oklahoma was foreseeable, and cite to *Regal-Beloit* for support. 130 S.Ct. at 2448. This reference is misplaced. In *Regal-Beloit*, the Court did not evaluate the knowledge of any party or evaluate whether it was foreseeable that the molds themselves would break through their crates. Instead, the Court simply observed that it was a "foreseeable event that cargo might be dam-

aged during carriage." *Id.* As we explained above, there is no evidence to show that it was foreseeable that the molds would break through their crates and cause a derailment, and the Court certainly was not suggesting that Plano should have foreseen that such an accident would have transpired.

Finally, appellants argue that Plano was liable for the alleged negligence of World and THI because apparent authority created an agency relationship between Plano and World, and because Plano exerted substantial control over World and THI during the shipping process. As we concluded previously, World was not acting as Plano's agent, and appellants' assertion of apparent authority does not alter our conclusion. Appellants argue that Plano's act of giving World the steel molds for shipment cloaked World with apparent authority to act on Plano's behalf. But Plano cites to nothing in the record to show that K-Line or Union Pacific believed that World was acting as Plano's agent. Moreover, as noted *supra*, Part II.A.2, there is a question of fact regarding whether Plano or CMT engaged World as a contracting party.

The record simply does not support the assertion that Plano exercised substantial control over either World or THI during the shipping process. As to World, appellants point to the fact that Plano "ordered" World to ship the molds "FCL", that Plano provided World with the specifications of the molds, and that Plano instructed CMT on when to initiate the shipping procedure. These few instructions, however, do not show that Plano "con-

trolled" World. Rather, Plano simply provided basic instructions to World regarding the molds' shipment. Plano did not instruct World on which carriers to employ, and no Plano employees had any communications with THI, the company that carried out the loading and stowage of the molds.

Plano had no indication that World, Kunshan, or THI would be unable to properly package and transport its steel molds from China to the United States, nor did Plano have any special knowledge of any unique danger the molds would pose during transit. Moreover, Plano did not form an agency relationship with either World or THI. Accordingly, Plano owed no special duty of care to the carriers, and cannot be held liable for negligence.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment as to appellants' contract claims based on the World bill of lading and REMAND for further disposition consistent with this opinion. We AFFIRM the district court's grant of summary judgment as to appellants' negligence claims.