In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 23-1782 & 23-2422

CERTAIN UNDERWRITERS AT LLOYD'S,

*Plaintiff-Appellant,*

*v.*

CSX TRANSPORTATION, INC. and EVANSVILLE WESTERN RAILWAY, INC.,

*Defendants-Appellees.*

———————

Appeals from the United States District Court for the
Southern District of Illinois.
No. 3:20-cv-00795 — **Stephen P. McGlynn**, *Judge.*

———————

ARGUED APRIL 3, 2024 — DECIDED JUNE 25, 2026

———————

Before ST. EVE, KIRSCH, and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. National Railway Equipment (NRE) shipped four locomotives via rail carriers to North Carolina, but the locomotives derailed en route during Hurricane Florence. NRE's insurer, Certain Underwriters at Lloyd's (Lloyd's), paid NRE under the terms of its insurance policy. To recoup its payment as NRE's subrogee, Lloyd's sued Evansville Western Railway, Inc. (EVWR), and CSX

Transportation, Inc. (CSX), under the Carmack Amendment, 49 U.S.C. § 11706. In response, EVWR and CSX asserted that any liability they might owe to NRE (and, thereby, Lloyd's) was subject to caps specified in their shipping contracts.

The district court granted EVWR's motion for summary judgment against Lloyd's, and a jury found in CSX's favor at trial. Lloyd's then filed a motion for judgment as a matter of law against CSX pursuant to Federal Rule of Civil Procedure 50, which the court denied. Lloyd's now appeals the district court's summary judgment order as well its post-trial ruling. We affirm.

## I
## Background

NRE rebuilds locomotives for sale. Jay Smith, NRE's Corporate Logistics Manager, was tasked with delivering four newly rebuilt locomotives from NRE's production facility in Mount Vernon, Illinois, to a customer in Africa. To do so, Smith arranged for rail carriers to transport the locomotives from Mount Vernon to the Port of Wilmington, North Carolina, so they could be shipped abroad by boat.

Using EVWR's online system, Smith engaged it to transport the locomotives via rail from Mount Vernon to Evansville, Indiana. He also specified that CSX was to take the locomotives from Evansville to Wilmington. Smith was no stranger to EVWR's system having used it to transport locomotives twenty to twenty-five times a year during his seventeen years as NRE's logistics manager. He also had contracted with CSX about thirty to forty times a year to do the same.

When entering the order, Smith identified the cargo as locomotives that move on their own wheels by using Standard

Transportation Commodity (STC) Code 3741110. (STC Codes are industry-wide designations used by shippers and carriers to describe the item being shipped.) Smith also indicated that he wanted the locomotives shipped from Mount Vernon to Wilmington. The system then relayed that information to the rail carriers and created four bills of lading, one for each locomotive. The bills of lading identified each locomotive as STC Code 3741110 and covered both legs of the journey.

Both rail carriers maintain a publicly available price sheet for hauling goods carrying the STC Code 3741110 designation. For EVWR, the public price list for STC Code 3741110 goes by "EVWR Q 5012." And, in exchange for a customer agreeing to a EVWR Q 5012 rate, EVWR agrees to bear a maximum liability of $25,000 per item in the event of an accident or other covered event. As for CSX, it too has a publicly available price sheet for STC Code 3741110, "CSXT Public Price List 6051." And, when a customer elects that rate, CSX's maximum liability is $10,000 per item shipped. Smith could have elected to pay higher rates to the carriers to increase the respective maximum liability amounts, but he chose not to do so because NRE had its own insurance coverage through its insurer, Lloyd's.

While CSX was transporting the four locomotives from Evansville to Wilmington, the train encountered Hurricane Florence, and the locomotives were destroyed in a derailment near Lilesville, North Carolina. NRE filed a claim with Lloyd's, and the insurer paid NRE the full invoice value of the destroyed locomotives minus the applicable deductible.

As NRE's subrogee, Lloyd's sued EVWR and CSX to recover what it had paid to NRE. According to Lloyd's, EVWR and CSX were fully liable for the loss of the locomotives under

the Carmack Amendment. In response, the carriers argued that whatever liability they owed to NRE was capped by the liability limitations to which NRE had agreed when Smith placed the orders with EVWR and CSX.

After discovery, the parties filed cross-motions for summary judgment. The district court agreed with Lloyd's that it had established a *prima facie* case under the Carmack Amendment. Nonetheless, the court granted EVWR's motion, concluding that the undisputed facts established that NRE had agreed to limit EVWR's liability to $25,000 per locomotive. The court, however, proceeded to deny CSX's summary judgment motion, finding certain factual disputes, and set the claim against CSX for trial.

At trial, the jury found in favor of CSX, capping its liability to $10,000 per locomotive. After the adverse verdict, Lloyd's filed a Rule 50 motion for judgment as a matter of law, which the court denied. The court then entered judgment in favor of Lloyd's but limited its recovery to the maximum liability amounts specified in the shipping contracts along with prejudgment interest. Lloyd's appeals the district court's order granting summary judgment to EVWR and its order denying the Rule 50 motion.

## II
## Discussion

We review the grant of summary judgment *de novo*, viewing disputed facts and drawing reasonable inferences in the light most favorable to the nonmovant. *See Nelson v. Town of Paris*, 78 F.4th 389, 395 (7th Cir. 2023). Likewise, we review the denial of a Rule 50 motion for judgment as a matter of law *de novo*, but we are "obliged to leave the judgment undisturbed unless the moving party can show that no rational jury could

have brought in a verdict against it." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2023) (citation modified).

The Carmack Amendment, 49 U.S.C. § 11706, "governs liability of a common carrier to a shipper for loss of, or damage to, an interstate shipment." *N. Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir. 1996). Prior to its enactment, a common carrier's liability for loss of or damage to interstate shipments was a matter of common law or state positive law. *See id.* at 456. As a result, "it was practically impossible for a shipper engaged in a business that extended beyond the confines of his own state … to know … what would be the carrier's actual responsibility as to goods delivered to it for transportation from one state to another." *Adams Express Co. v. Croninger*, 226 U.S. 491, 505 (1913) (citation modified). This unpredictable regime led Congress to pass the Carmack Amendment, which provides a "uniform rule and relieve[s] such contracts from the diverse regulation to which they had been theretofore subject." *Id.* at 506. Put another way, the Carmack Amendment was enacted "to secure the rights of the shipper by securing unity of transportation with unity of responsibility." *Atl. Coast Line R.R. Co. v. Riverside Mills*, 219 U.S. 186, 203 (1911).

Under the Carmack Amendment, a carrier is generally liable "for the actual loss or injury to the property." 49 U.S.C. § 11706(a). At the same time, the statute provides ways that a carrier can limit this liability. *Id.* § 11706(c)(1). One option allows a carrier to "establish rates for transportation of property under which … the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper

and the carrier." *Id.* § 11706(c)(3). Stated differently, a "carrier may, by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." *Adams Express*, 226 U.S. at 509–10. This practice is consistent with "the settled principles of the common law preventing a carrier from contracting against liability for losses resulting from its own negligence, and are lawful limitations upon the amount of recovery binding upon the shipper upon principles of estoppel." *Bos. & Me. R.R. v. Piper*, 246 U.S. 439, 444 (1918). Thus, where a carrier offers a shipper with a choice of rates, each with its associated liability limitation, the shipper is "bound by the one chosen." *Id.*

To limit its liability in this way, a carrier must do three things: (1) "give the shipper a reasonable opportunity to choose between two or more levels of liability;" (2) "obtain the shipper's agreement as to a choice of liability;" and (3) "issue a receipt or bill of lading prior to moving the shipment." *Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, 687 F.3d 780, 782 (7th Cir. 2012).

Lloyd's advances two principal arguments in the present appeal. First, it posits that EVWR and CSX cannot take advantage of their respective limitations of liability because neither offered NRE a reasonable opportunity to choose between a rate offering full-liability coverage and another providing limited-liability coverage. Relatedly, Lloyd's contends that NRE's written agreement with EVWR and CSX did not sufficiently state the liability limits as § 11706(c)(3)(A) requires. *See* 49 U.S.C. § 11706(c)(3)(A) (stating that the liability limitation

must be "established by written declaration of the shipper or by a written agreement between the shipper and the carrier").

For both arguments, Lloyd's leans heavily on *ABB Inc. v. CSX Transportation, Inc.*, 721 F.3d 135 (4th Cir. 2013). In that case, ABB wanted to transport an electrical transformer by rail. Turning to CSX, ABB repeatedly requested rate information from the carrier but received no response. *Id.* at 141. ABB eventually engaged CSX and listed the full value of the transformer on the bill of lading but not the shipping rate (which it did not have). *Id.* When the equipment was damaged in transit, ABB sued CSX under the Carmack Amendment for the entire amount of the loss. *Id.*

In response, CSX asserted that its liability was limited to $25,000 based on two items. *Id.* at 140. First, in the bill of lading, ABB had certified that it was familiar with "the classification or tariff which governs the transportation of this shipment." *Id.* at 143. Second, approximately six months before the shipment, CSX had issued a price list (entitled "CSX Price List 4605") that expressly limited the carrier's liability in such cases to $25,000 per shipment. *Id.* at 141. These two data points, CSX argued, demonstrated that ABB was aware of the $25,000 cap. *Id.* at 140. It was undisputed, however, that ABB's logistics manager had always contacted CSX directly for the shipping rate and was unaware of the price list. *Id.* at 141.

The district court granted summary judgment in CSX's favor, but the Fourth Circuit reversed. Of particular importance was the absence of any evidence that ABB had utilized the CSX price list or had any knowledge of it. Indeed, ABB's inquiries to CSX had gone unanswered. The appellate court also pointed to the bill of lading that was "silent regarding any current rate, classification, or other specific authority

governing the shipment." *Id.* at 142–43. "To permit a carrier to assume that a shipper is familiar with a carrier's price list, without any manifestation of that familiarity in the bill of lading or in an external agreement limiting the carrier's liability," the appellate court stated, "would be contrary to the Carmack Amendment's command that a carrier may only limit liability pursuant to an express, written agreement with the shipper." *Id.* at 143 (citing 49 U.S.C. § 11706(c)). The record lacked what § 11706(c)(3)(A) requires—"a written agreement that is sufficiently specific to manifest that the shipper in fact agreed to a limitation of liability." *Id.* at 142.

Lloyd's likens ABB's situation to the circumstances Smith faced here. But the two scenarios are markedly different. Unlike the ABB's logistics manager, it is undisputed that Smith was aware of EVWR's and CSX's published shipping rates and knew that he could have sought a greater level of liability coverage. And, based on this knowledge, Smith affirmatively chose lower rates that came with limited liability coverage because NRE had its own insurance coverage in the event of an accidental loss. Thus, it is beyond reasonable dispute that EVWR and CSX had provided NRE with a choice of varying levels of liability coverage, something that was absent in *ABB*.

Citing *ABB*, Lloyd's also argues that, under the Carmack Amendment, a bill of lading must expressly state the liability cap for one to be effective. But not even the *ABB* court went this far. In that case, the bill of lading lacked any reference to "an identifiable classification, a rate authority code, a price list, or any other indication that the carrier assumed only limited liability." 721 F.3d at 143. In fact, if the bill of lading had merely referenced the price list, the *ABB* court observed, CSX would have been entitled to summary judgment "even if ABB

had not actually been aware of the limitation of liability contained in that price list." *Id.*

Here, of course, the bills of lading listed the STC Code. The parties, however, dispute its significance. To Lloyd's, the code simply identifies the item to be shipped. By contrast, EVWR and CSX argue that the code is a contractual term that evidences the parties' intent to be bound by the carrier's limits on their liability.

As we stated in *Nipponkoa*, "[a] bill of lading serves as a contract." 687 F.3d at 782; *see Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 30 (2004) (stating that construing a bill of lading "is a simple question of contract interpretation."). And, because it is governed by the Carmack Amendment, we construe its terms using "standard principles of contract law—more precisely, the core principles of the common law of contract that are in force in most states." *S&O Liquidating P'ship v. Comm'r*, 291 F.3d 454, 459 (7th Cir. 2002) (quoting *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996)).

Applying these principles here, we must first determine as a matter of law whether the meaning of the STC Code as it appears in the bills of lading is ambiguous—that is, whether it "is subject to reasonable alternative interpretations." *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) (internal quotations omitted).

If the meaning of the STC Code is ambiguous, "it generally becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008) (construing federal common law). That said, where the "extrinsic evidence that is material is uncontested" or "so

overwhelmingly favors one interpretation of the contract that no reasonable person could decide to the contrary," a trial is not necessary, and the issue can be decided on summary judgment. *Id.* (internal quotation marks omitted).

To establish ambiguity, a party is not limited to the four corners of the agreement. Instead, "[u]nder the doctrine of extrinsic ambiguity," a party may introduce extrinsic objective evidence to establish an ambiguity. *United States v. Rand Motors*, 305 F.3d 770, 774–75 (7th Cir. 2002) (citation omitted). This is because "[a] contract might seem clear only because the judicial reader didn't understand the commercial context of the contract—the nonstandard verbal usages current in the activity out of which the contract arose." *Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 556 (7th Cir. 2002).

Extrinsic evidence is objective if it is "supplied by disinterested third parties." *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 568 (7th Cir. 1995). And the contracting parties' prior course of dealing qualifies. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 818 (7th Cir. 2010).

Here, EVWR and CSX rely on their course of dealing with NRE to both establish the facial ambiguity of the STC Code and prove its meaning. First, the carriers note that the STC Code itself does not identify any associated liability, nor does Lloyd's argue otherwise. Furthermore, the carriers point to Smith's undisputed testimony that he had contracted with EVWR and CSX multiple times annually over the course of seventeen years to transport NRE's locomotives. What is more, Smith recounted that he had always selected the lower shipping rate because he knew that NRE had other insurance. Thus, according to Smith, when he entered STC Code 3741110

into the system to generate bills of lading that contained that code, it signified to EVWR and CSX that NRE was selecting the shipping rate that provided only limited liability coverage. Given this, the district court was correct to conclude that the STC Code as it appeared in the bills of lading was an ambiguous contractual term.[1]

But that does not end our inquiry. Once a contractual term is deemed ambiguous, its meaning must be sussed out. As for EVWR, the summary judgment record irrefutably established what NRE and EVWR intended the listing of the STC Code to mean. According to Smith's deposition testimony, he understood that, by entering the STC Code, he was choosing EVWR's rate that capped the carrier's liability at $25,000 per unit. Lloyd's offered nothing to dispute that understanding nor did it present any evidence from which a reasonable jury could find that EVWR's understanding differed in any material way. Thus, the district court's entry of summary judgment as to EVWR was proper.

As for CSX, Smith testified at trial that, by entering the STC Code into the system, he knew that the code would appear on the CSX bills of lading and that he was selecting the carrier's rate that provided a liability cap of $10,000 per unit. Smith admitted that he had not included express language in the bills of lading to this effect, but he insisted that by including the STC Code, he was requesting CSX's lowest rate with its accompanying liability limitation as he had done on multiple

---

[1] Although Smith is an employee of NRE, it is undisputed that the company was compensated in full for the loss of the four locomotives. Accordingly, on this record, neither NRE nor Smith can be said to be interested parties to this action.

prior occasions. Given this and the other evidence at trial, all of which must be viewed in CSX's favor, the district court correctly denied Lloyd's motion for judgment as a matter of law.

*          *          *

The judgment of the district court is AFFIRMED.