Vacated in part and remanded by-published opinion. Judge KEENAN wrote the opinion, in which Judge FLOYD joined. Judge AGEE wrote a separate opinion concurring in part and dissenting in part.
BARBARA MILANO KEENAN, Circuit Judge:
In March 2006, rail carrier CSX Transportation, Inc. (CSX) transported an electrical transformer worth about $1.3 million from shipper ABB Inc.’s plant in St. Louis, Missouri to a customer in Pittsburgh, Pennsylvania (the March 2006 shipment). ABB Inc. (ABB) later filed a complaint in the district court alleging that the transformer was damaged in transit, and that CSX was liable for over $550,000, the full amount of the damage. CSX denied full liability, and alternatively contended that even if the court found CSX liable for the cargo damage, the parties had agreed in the bill of lading to limit CSX’s liability to a maximum of $25,000.
The district court held that the parties had limited CSX’s potential liability in the bill of lading to $25,000. The parties thereafter entered into a consent judgment, reserving ABB’s right to appeal the district court’s resolution of the liability limit issue. Upon our review, we conclude that the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11706, subjected CSX to full liability for the shipment, and that the parties did not modify CSX’s level of liability by written agreement as permitted in that statute. We therefore vacate the portion of the district court’s judgment limiting any liability on the part of CSX to $25,000.
I.
We begin with a discussion of the complex regulatory scheme governing interstate freight shipments, and the historical context in which the shipment in this case occurred. We also address the role of the Carmack Amendment, which restricts carriers’ ability to limit their liability for cargo damage.
A.
In 1887, Congress enacted the Interstate Commerce Act (ICA), 24 Stat. 379, to regulate the transportation industry. Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 183 (3d Cir.2006). The Interstate Commerce Commission (ICC) initially was designated to administer this regulatory regime, but was replaced in 1995 by the Surface Transportation Board. Id. at 183, 186; ICC Termination Act of 1995, Pub.L. No. 104-88, 109 Stat. 803, 932-34. Among other things, the ICC “regulated the railroad industry by requiring rates to be ‘reasonable and just’ and prohibited certain railroad practices, such as rate discrimination [and] price fixing,” and eventually expanded to include the regulation of motor vehicle transportation. Emerson, 451 F.3d at 183.
Until 1995, carriers were required to file their rates, or “tariffs,” publicly with the ICC. Tempel Steel Corp. v. Landstar Inway, Inc., 211 F.3d 1029, 1030 (7th Cir.2000); Comsource Indep. Foodserv. Cos. v. Union Pac. R.R., 102 F.3d 438, 442 (9th Cir.1996). Under this scheme, “the filed rate governed] the legal relationship between shipper and carrier,” and the carrier could not deviate from the published tariff. Maislin Indus., U.S. v. Primary Steel, 497 U.S. 116, 119-20, 126, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). For these reasons, shippers and carriers generally were *138 charged with notice of the terms that were required to be included in the carrier’s published tariffs. See id. at 127, 110 S.Ct. 2759 (citing Louisville & Nashville R.R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915)).
In 1995, in an effort to ease regulatory burdens on the transportation industry, Congress abolished the requirement that tariffs be filed as public documents. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803; Tempel Steel Corp., 211 F.3d at 1030. The term “tariff,” even when still used by shippers and carriers “out of habit,” is now merely a contractual term with “no effect apart from [its] status as [a] contract[ ].”[1] Tempel Steel Corp., 211 F.3d at 1030.
B.
The Carmack Amendment, 49 U.S.C. § 11706,[2] originally enacted in 1906 as an amendment to the ICA, “creates a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading.”[3] 5K Logistics, Inc. v. Daily Express, Inc., 659 F.3d 331, 335 (4th Cir.2011) (citation and internal quotation marks omitted). The statute requires that a rail carrier issue a bill of lading for property it transports, and that a carrier is liable to the “person entitled to recover” under the bill of lading “for the actual loss or injury to the property” caused by a carrier.[4] 49 U.S.C. § 11706(a). The Carmack Amendment specifies that “[failure to issue a receipt or bill of lading does not affect the liability of a rail carrier.” Id.
Subsection (c) of the statute provides only a limited exception to full carrier liability:
(1) A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, or rule in violation of this section is void....
(3) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which—
*139 (A) the liability of the mil carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier
49 U.S.C. § 11706(c) (emphasis added). In other words, the Carmack Amendment “constrains carriers’ ability to limit liability by contract,” Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., — U.S.—, 130 S.Ct. 2433, 2441, 177 L.Ed.2d 424 (2010), by requiring that a rail carrier remains fully liable for damage caused to its freight unless the shipper has agreed otherwise in writing. 49 U.S.C. § 11706(a), (c); see also Emerson, 451 F.3d at 186 (“[A] carrier’s ability to limit [its] liability is a carefully defined exception to the Carmack Amendment’s general objective of imposing full liability for the loss of shipped goods.”) (quoting Carmana Designs Ltd. v. N. Am. Van Lines, Inc., 943 F.2d 316, 319 (3d Cir.1991)) (internal quotation marks omitted).[5] The Carmack Amendment thus protects shippers from attempts by carriers to avoid liability for damage to cargo under the carriers’ control, and “relieve[s] cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.” Kawasaki, 130 S.Ct. at 2441 (citation omitted).
To determine whether a carrier has limited its liability consistent with the strictures of the Carmack Amendment, courts have applied a four-part test, under which carriers must: (1) provide the shipper, upon request, a copy of its rate schedule; [6] (2) “give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper’s agreement as to his choice of carrier liability limit; and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement.” OneBeacon Ins. Co. v. Haas Indus., 634 F.3d 1092, 1099-1100 (9th Cir.2011); see also Chandler v. Aero Mayflower Transit Co., 374 F.2d 129, 137 (4th Cir.1967) (explaining the requirement of “reasonable notice” to choose between levels of liability). The Carmack Amendment’s exception allowing for limited liability is “a very narrow exception to the general rule” imposing full liability on the carrier. Toledo Ticket Co. v. Roadway Express, 133 F.3d 439, 442 (6th Cir.1998) (citing Carmack Amendment for motor carriers, as previously codified at 49 U.S.C. § 10730). Courts “will [ ] carefully scrutinize[ ]” any alleged limitation of liability “to assure that the shipper was given a meaningful choice and exercised it as evidenced by a writing.” Aero Automation Sys. v. Iscont Shipping, 706 F.Supp. 413, 416 (D.Md.1989).
II.
In its complaint filed against CSX, ABB alleged that CSX was liable for the “actual *140 loss or injury arising from the damage to the [transformer” under the Carmack Amendment. ABB also asserted state law claims for negligence and breach of contract.
CSX did not admit liability, but raised as an affirmative defense that any liability on its part was limited to a maximum of $25,000.[7] CSX argued that the bill of lading (BOL) executed by ABB had incorporated by reference a $25,000 liability limitation contained in a separate price list used by CSX.
The district court did not consider the issue whether ABB had established a pri-ma facie case of liability against CSX but, on submissions by the parties, proceeded to consider the liability limitation issue. The court awarded summary judgment to CSX based on its defense that it had limited its liability. The court also reasoned that the Carmack Amendment did not apply to the shipment because the shipper, rather than the carrier, had drafted the BOL. Pursuant to the consent judgment entered into by the parties, ABB timely appealed from the district court’s determination regarding CSX’s limitation of liability.[8]
■ Before beginning our analysis of the Carmack Amendment, we describe the two documents central to our resolution of this appeal. First, the BOL governing the March 2006 shipment is a partially completed copy of ABB’s standardized bill of lading. The BOL included general information about the shipment, such as the date of transport, pick-up and destination locations, and scheduled transportation route. In the space on the form labeled “product value,” ABB’s traffic manager, Brian Brueggeman, entered “$1,384,000.” Although the box labeled “prepaid” (compared with “collect”) was marked, the BOL did not include a price for the shipment or indicate the level of liability assumed by CSX for lost or damaged cargo.[9] The space labeled “rate authority” was left blank, as was the box that included the following pre-printed language:
NOTE — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding $-.[10]
The BOL also included certification language, which provided in part:
It is mutually agreed ... that every service to be performed hereunder shall be subject to all the terms and conditions the Uniform Domestic Straight Bill of Lading set forth ... in Uniform Freight Classification in effect on the date hereof, if this is a rail or a rail-water shipment ...
Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classi *141 fication or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.
(emphasis added).[11] The BOL was signed by Brueggeman.
The second document at issue in this appeal is CSX Price List 4605, which was “issued” by CSX on November 18, 2005 and became “effective” on December 14, 2005. This twelve-page document sets forth numerous rules applicable to CSX’s transportation of machinery, such as, for example, procedures related to billing and to the loading and unloading of cargo. Relevant to this appeal is the section of Price List 4605 entitled “price restrictions.” This section lists eighteen provisions, including the following:
Carriers’ maximum liability for lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote.
CSX’s corporate representative, Joseph McCauley, testified in his deposition that Price List 4605 does not provide varying rates associated with different levels of liability, and that in order to receive coverage for full liability under the list, a shipper must negotiate a rate directly with the carrier.
Neither Brueggeman nor his predecessor in ABB’s traffic manager position, Craig Steffey, was aware of the existence of Price List 4605 prior to the March 2006 shipment. During his tenure, Steffey had obtained rate information from CSX by contacting the carrier directly and obtaining a quote specific to the intended shipment.
With respect to the March 2006 shipment at issue in this appeal, Brueggeman sought rate information on multiple occasions without success from CSX personnel and from the CSX website,[12] and thus was unable to complete the space designated on the BOL for the “rate authority.”[13] Brueggeman explained that because he had been unable to obtain the rate authority in advance, he would only learn the price of the shipment when he eventually received an invoice from CSX.
III.
ABB argues that the district court erred in failing to apply the Carmack Amendment to ABB’s shipment. According to ABB, because the parties did not agree in writing to limit the carrier’s liability, CSX is liable under the plain language of the Carmack Amendment for the full value of the cargo damage.
In response, CSX argues that ABB, as the drafter of the BOL, is not entitled to the protection of the Carmack Amendment *142 and that, regardless, the BOL incorporated by reference the limitation of liability included in Price List 4605.[14] We disagree with CSX’s arguments.
We nevertheless observe at the outset that ABB’s problem in this case is partly of its own making. The record reflects that Brueggeman did not exercise due diligence in performing a key aspect of his job, namely, negotiating and obtaining rate and liability information for the shipment of very expensive equipment.[15] We also recognize that ABB could have prevented many of the problems that occurred in this case not only by properly negotiating the shipping rate, but also by revising its standardized bill of lading to exclude outdated references to “tariffs” and “classifications” that were part of the pre-1995 regulatory scheme.
Despite ABB’s failures, however, the Carmack Amendment imposed the burden of securing limited liability on the carrier, CSX, not on the shipper, ABB. 49 U.S.C. § 11706; Aero Automation Sys., 706 F.Supp. at 416. The plain language of the statute provides that in the absence of a clear, written agreement by the shipper, the carrier is subject to full liability for actual losses. See 49 U.S.C. § 11706(a), (c).
To overcome this default posture of full liability imposed by the Carmack Amendment, the carrier and the shipper must have a written agreement that is sufficiently specific to manifest that the shipper in fact agreed to a limitation of liability. “[A] carrier cannot limit liability by implication. There must be an absolute, deliberate and well-informed choice by the shipper.” Aero Automation Sys., 706 F.Supp. at 416 (citation omitted). Without a rule requiring at least some specificity in a written agreement, the shipper would not have “a reasonable opportunity to choose between two or more levels of liability,” OneBeacon Ins. Co., 634 F.3d at 1099, but instead would be automatically and unwittingly subject to the carrier’s unilateral choice of a rate authority. Cf. N.Y., New Haven & Hartford R.R. Co. v. Nothnagle, 346 U.S. 128, 135-36, 73 S.Ct. 986, 97 L.Ed. 1500 (1953) (“Binding [the shipper] by a limitation which [the shipper] had no reasonable opportunity to discover would effectively deprive [the shipper] of the requisite choice; such an arrangement would amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts.”).
We disagree with the district court’s conclusion that, as a general matter, the Carmack Amendment does not apply when the shipper drafts the bill of lading. The text of the Carmack Amendment imposes full liability on carriers, without regard to which party prepared the bill of lading. The statute provides that a carrier’s failure to issue a bill of lading “does not affect the liability of a rail carrier.” 49 U.S.C. § 11706(a).
In this case, the parties did not reach a written agreement to limit CSX’s liability and, accordingly, the Carmack Amendment operated to impose full liability on CSX. On its face, the BOL governing the March 2006 shipment was silent regarding the extent of CSX’s liability. The space on *143 the BOL labeled “rate authority,” where a notation regarding rate and liability normally would be listed, was left blank. Moreover, the BOL did not contain any references to an identifiable classification, a rate authority code, a price list, or any other indication that the carrier assumed only limited liability.
CSX contends, nonetheless, that Price List 4605 is incorporated by reference into the BOL through standardized language appearing on the BOL, indicating that the shipper agreed to the terms and conditions in “the classification or tariff which governs the transportation of this shipment.” In CSX’s view, this standardized language is adequate to meet the “written agreement” exception for avoiding full liability under the Carmack Amendment.
We cannot endorse CSX’s position urging limited liability under these circumstances, because the language in the BOL does not specifically reference Price List 4605. Under CSX’s proposed rule, shippers would be charged with notice of a private price list created by the carrier, even when the list was not filed for public inspection, the shipper had not previously shipped cargo pursuant to that list, and the shipper had sought the pricing information unsuccessfully from the carrier before drafting the BOL. Under such a theory, the shipper’s “knowledge” of the list could be proved solely by use of the generic and outdated word “tariff” being employed as standard language in a bill of lading.
Prior to deregulation, courts reasonably held shippers to constructive knowledge of a published tariff based on a generic reference to the tariff in a bill of lading. See Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1087-89 (2d Cir.1985). Today, however, carriers are not required to file such public tariffs. Tempel Steel Corp., 211 F.3d at 1030. To permit a carrier to assume that a shipper is familiar with a carrier’s price list, without any manifestation of that familiarity in the bill of lading or in an external agreement limiting the carrier’s liability, would be contrary to the Carmack Amendment’s command that a carrier may only limit liability pursuant to an express, written agreement with the shipper. 49 U.S.C. § 11706(c).
Extended to its logical extreme, CSX’s proposed rule would encourage absurd results. One such example would be a situation in which the bill of lading references a general “tariff,” but does not specify a particular rate authority or other code indicating the applicable rate and liability level. In the absence of publicly filed tariffs, or a citation to a specific rate authority or code, a carrier could change unilaterally its level of liability, unbeknownst to the shipper, by altering its price list a day before the shipment takes place.
Additionally, we observe that a decision in favor of CSX would be required if Price List 4605 had been referenced specifically in the BOL, even if ABB had not actually been aware of the limitation of liability contained in that price list. In such a circumstance, the shipper reasonably would be charged with notice of the meaning of a precise, currently applicable term that the shipper included in the BOL.
The Eleventh Circuit’s decision in Siren, Inc. v. Estes Express Lines, 249 F.3d 1268 (11th Cir.2001), on which the district court and CSX have relied, is distinguishable on this basis. In Siren, the shipper prepared the bill of lading and noted twice that the shipment would move under “Class 85,” a term understood in the trucking industry as limiting liability to a certain amount per pound of cargo, although the shipper maintained it had no actual knowledge that this class designation provided such a limitation of liability. 249 F.3d at 1269, 1272. Nevertheless, the shipper was aware that *144 it had received a significant discount from the carrier’s full liability rate for the shipment in question, and that the rate it received was based on the “Class 85” designation. Id. The Eleventh Circuit concluded that, because “[the shipper] drafted the bill of lading, [the shipper] chose to use the term ‘Class 85’, [the shipper] did not rebut [the carrier’s] assertion at trial that ‘Class 85’ included a limiting aspect, [the shipper] knew ‘Class 85’ determined the freight rate charged, and [the shipper] knew that it received a 62% discount from [the] full freight rate,” the shipper could not avoid the limitation of liability it had included in the contract, because it was not “proper or necessary to protect shippers from themselves.” Id. at 1271,1273.
We agree with the Eleventh Circuit’s determination that, by including a specific class designation in the bill of lading, the shipper was bound to the terms and conditions associated with that class designation. Cf. Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 612 (9th Cir.1992) (holding that a shipper had “reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting” a limit of liability when the shipper drafted the bill of lading and negotiated its terms). In the present case, however, the BOL is entirely silent regarding any current rate, classification, or other specific authority governing the shipment. There also is no evidence that the parties had a written agreement establishing a limit of liability separate from the BOL. Therefore, as discussed above, we decline to conclude that a shipper should be held to notice of a privately held price list based only on generic and ambiguous language referencing a “tariff’ or “classification.”[16]
Our conclusion that the parties did not agree to a liability limitation is not altered by CSX’s reliance on its past course of dealing with ABB. The Carmack Amendment’s requirement of a written agreement undermines CSX’s argument that the parties’ alleged course of dealing can serve as a substitute for a written limitation of liability for a particular shipment. See Mooney v. Farrell Lines, Inc., 616 F.2d 619, 626 (2d Cir.1980) (declining to limit a carrier’s liability by evidence of the parties’ course of dealing, when the liability limit was not included in the bill of lading); cf. Camar Corp. v. Preston Trucking Co., 18 F.Supp.2d 112, 115 (D.Mass.1998) (rejecting argument that the shipper’s sophistication and the parties’ course of dealing evidenced an “absolute, deliberate and well-informed choice by the shipper” to limit the carrier’s liability, in the absence of a bill of lading or other written agreement).
Moreover, the present record lacks any evidence that ABB previously had shipped under the terms of Price List 4605, or otherwise was familiar with that list. Of the seventy-three total bills of lading pre *145 dating March 2006 in the record, none references Price List 4605. Indeed, Price List 4605 was issued in November 2005 and became effective in December 2005, only three months before the shipment at issue in this case, and there is no evidence that ABB shipped any cargo pursuant to that list in the interim three-month period.
Of the nine ABB-CSX bills of lading included in the record, several different rate authority codes were used, and the record contains no evidence regarding the limits of liability associated with those codes.[17] Steffey, Brueggeman’s predecessor in the traffic manager position, testified that he entered these rate authorities on the bills of lading after being instructed to do so by CSX representatives with whom he had negotiated rates for particular shipments, not because he was generally familiar with CSX price lists. Counsel for CSX also conceded at oral argument that CSX’s price lists are regularly changing, further undermining the contention that ABB should have been familiar with Price List 4605 at the time of the shipment.[18]
We appreciate the common sense observation that a shipper drafting an imprecise bill of lading should not stand to benefit from its own lack of precision, as well as the district court’s reflection that such a shipper need not be protected from itself. Nevertheless, we are bound by the express language of the Carmack Amendment, which puts the burden on the carrier to demonstrate that the parties had a written agreement to limit the carrier’s liability, irrespective whether the shipper drafted the bill of lading. See 49 U.S.C. § 11706(a), (c). The general contract principle that ambiguous contracts be construed against the drafter, see, e.g., Wheeler v. Dynamic Eng’g, 62 F.3d 634, 638 (4th Cir.1995), is inapplicable in the face of statutory language that unambiguously imposes the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper.[19]
Finally, we note that important practical considerations support the conclusion we reach today. Shippers by necessity entrust rail carriers with the safekeeping of expensive cargo and, under the Carmack Amendment, are entitled to presume that carriers will be held fully responsible for damage incurred during transit unless otherwise agreed. Our ruling encourages parties to employ precise bills of lading, which reflect fully and specifically the parties’ choice of liability terms, and to memorialize these terms in writing as Congress intended by passage of the Carmack Amendment. See 49 U.S.C. § 11706.
IV.
In sum, we conclude that the district court erred in awarding summary judgment in favor of CSX on its claimed liability limitation of $25,000. We therefore vacate the portion of the district court’s *146 judgment fixing that liability limitation and remand the case for further proceedings consistent with this opinion.

VACATED IN PART AND REMANDED.

. At the time of the 1995 deregulation, Congress imposed on rail carriers a new obligation to make their rates available to shippers, in lieu of the public-filing requirement. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, 830 (codified at 49 U.S.C. § 11101). Section 11101(b) provides:
A rail carrier shall also provide to any person, on request, the carrier’s rates and other service terms. The response by a rail carrier to a request for the carrier's rates and other service terms shall be—
(1) in writing and forwarded to the requesting person promptly after receipt of the request; or
(2) promptly made available in electronic form.

. This appeal involves rail carriers, which are subject to the provisions of 49 U.S.C. § 11706. Today, motor carriers are also subject to a separate provision of the Carmack Amendment, codified at 49 U.S.C. § 14706.

. A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.” Norfolk S. Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 18-19, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

. To establish a prima facie case of carrier liability under the Carmack Amendment, a shipper must show (1) delivery of the goods to the carrier in good condition; (2) the cargo's arrival in damaged condition; and (3) the amount of damages. Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294 (4th Cir.1990).

. In this opinion, we reference cases involving the transportation of goods by motor vehicles under Section 14706, as well as cases involving rail carriers under Section 11706. As relevant here, pursuant to Section 14706, motor carriers are by default liable for "the actual loss or injury to the property caused" by the carrier, but the carrier's liability may be limited "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.” 49 U.S.C. § 14706(a)(1), (c)(1)(A).

. Before deregulation, the first part of this test required that the carrier have maintained a tariff with the ICC. OneBeacon Ins. Co. v. Haas Indus., 634 F.3d 1092, 1099 (9th Cir.2011) (citing Hughes Aircraft Co. v. N. Am. Van Lines, 970 F.2d 609, 611-12 (9th Cir.1992)).

. CSX also argued in the district court that the parties had entered into a private shipping contract governed by 49 U.S.C. § 10709, but assumed for purposes of summary judgment that the shipment was subject to the Carmack Amendment.

. The district court also dismissed ABB’s state law claims, which decision is not at issue in this appeal.

. In his deposition testimony, Brueggeman stated that he thought that ABB would receive full liability coverage by declaring the value of the transformer in the body of the BOL, although he did not include a notation to this effect in the document.

. ABB employees were unable to edit or enter any information into this "declared value box” due to a feature of the computer program.

. In addition to the reference to a "tariff" in the certification, the following language appeared at the top of the BOL: "RECEIVED Subject to the Classifications and Lawfully filed, tariffs in effect on the date of the issue of this Bill of Lading” (emphasis added).

. Although McCauley claimed that Price List 4605 was available on the CSX website, Brueggeman testified that he could not recall ever seeing a price list, despite "lookfing] all over the website.” In any event, it is undisputed that shippers could not request a full liability quote from CSX through the website.

.At oral argument and in portions of its briefing, CSX appears to contest that Brueggeman attempted to obtain rate information for the shipment. Yet elsewhere in its briefing, CSX acknowledges that Brueggeman consulted the CSX website and made inquiries to certain CSX personnel. Despite CSX's allusions to the contrary, the record clearly indicates that Brueggeman affirmatively sought rate information from CSX, to no avail.

. Based on the facts of this case, we are not confronted with a possible "written declaration of the shipper” as an exception to the imposition of full liability under the Carmack Amendment. 49 U.S.C. § 11706(c)(3)(A). Accordingly, we address only the "written agreement” exception. Id.

. We note that CSX's conduct also was culpable, given CSX’s lack of accessibility to shippers over an extended period of time.

. We disagree with the dissent's contention that the facts of this case are "indistinguishable'' from the facts in Werner Enters, v. Westwind Mar. Int’l, Inc., 554 F.3d 1319 (11th Cir.2009). Post at 147-49. In Werner, the invoice for the shipment expressly notified the shipper of the potential for a limitation of liability. The invoice provided:
Third parties to whom the goods are entrusted may limit liability for loss or damage; the Company will request excess valuation coverage only upon specific written instructions from' the Customer, which must agree to pay any charges therefore; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company’s discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.
554 F.3d at 1322. In the present case, however, the BOL did not contain any such limiting language. In light of this material distinction, we conclude that Werner is inap-posite.

. On one of the ABB-CSX bills of lading, Steffey included the notation "FULL LIABILITY REQUIRED!!!,” at the direction of a CSX marketing representative.

. The dissent broadly asserts that ABB has admitted that in its past dealings with CSX, it "always had to expressly request full liability coverage in order to receive it.” Post at 148. We do not discuss the evidence underlying this broad assertion, because any alleged course of dealing prior to CSX’s implementation of Price List 4605 does not bear on the question whether the parties had memorialized in writing an agreement that the March 2006 shipment would proceed under Price List 4605.

.For the same reason, we disagree with the dissent’s reliance on the state law principle that a unilateral mistake does not justify rescission of a contract under the circumstances of this case. Post at 149-50 (citing Kassebaum v. Kassebaum, 42 S.W.3d 685, 693 (Mo.Ct.App.2001)).