RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EXEL, INC., f/u/b/o Sandoz, Inc.,
            *Plaintiff-Appellee/Cross-Appellant*,

*v.*

SOUTHERN REFRIGERATED TRANSPORT, INC.,
            *Defendant-Appellant/Cross-Appellee*.

⎤
⎟
⎟
⎟
⎬  Nos. 17-3904/3917
⎟
⎟
⎟
⎦

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00994—James L. Graham, District Judge.

Argued: August 1, 2018

Decided and Filed: September 25, 2018

Before: GILMAN, GIBBONS, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joshua S. Lipshutz, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant/Cross-Appellee. Marc Rubin, SPECTOR RUBIN, P.A., Miami, Florida, for Appellee/Cross-Appellant. **ON BRIEF:** Joshua S. Lipshutz, Thomas H. Dupree, Jr., Stephen P. Dent, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant/Cross-Appellee. Marc Rubin, SPECTOR RUBIN, P.A., Miami, Florida, Kendra L. Carpenter, FREYTAG CARPENTER LLC, Columbus, Ohio, for Appellee/Cross-Appellant.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. This case arises under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 et seq. Exel, Inc., a shipping

broker, sued Southern Refrigerated Transport, Inc. (SRT), an interstate motor carrier, after SRT lost a load of pharmaceuticals owned by Exel's customer, Sandoz, Inc., that was being transported from Pennsylvania to Tennessee. After nearly seven years of litigation, including a prior appeal, the district court entered judgment for Exel and awarded it the replacement cost of the lost pharmaceuticals, which amounted to approximately $5.9 million.

SRT now appeals, arguing that the district court erred in discounting the significance of language in the bills of lading that ostensibly limited SRT's liability to a small fraction of the shipment's value. Exel cross-appeals, arguing that the district court erred in measuring damages by the replacement cost of the pharmaceuticals rather than by their higher market value. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

In the prior appeal, *Exel, Inc. v. Southern Refrigerated Transport, Inc.*, 807 F.3d 140 (6th Cir. 2015) (hereinafter "*Exel I*"), this court summarized the facts giving rise to this litigation as follows:

> SRT is a motor carrier that provides transportation of cargo in interstate commerce. Exel, a freight broker, arranges for the transportation of its customer's commodities. In December, 2007, Exel and SRT executed a Master Transportation Services Agreement (MTSA). The MTSA is a standard agreement that Exel executes with any carrier it hires to transport its clients' goods. It establishes non-exclusivity, delineates various delivery terms, sets forth the billing arrangements and insurance requirements, and prescribes other terms that govern the parties' ongoing relationship. It does not contain shipment-specific terms.
>
> Section 4 of the MTSA states that Exel will issue freight receipts for each shipment. Further, "[i]f a bill of lading is issued as a freight receipt, any terms, conditions or provisions" in the bill of lading "shall be subject to and subordinate to the terms of" the MTSA, and "in the event of a conflict," the MTSA "shall govern." The MTSA also provides that SRT "shall be liable" to Exel for any "loss" to commodities shipped pursuant to the agreement, and that the "measurement of the loss . . . shall be the Shipper's replacement value applicable to the kind and quantity of Commodities so lost . . . ."

Sandoz, who is not a party to this litigation, is one of Exel's customers. In November, 2008, Exel arranged for SRT to transport a shipment of Sandoz's pharmaceuticals from Exel's warehouse in Mechanicsburg, Pennsylvania, to Memphis, Tennessee. Before the shipment, Exel prepared five documents, designated as bills of lading, on Sandoz's behalf. Exel personnel loaded the pharmaceuticals onto SRT's container. Exel personnel signed the bills of lading and gave them to the SRT driver, who also signed them.

The bills of lading include the number of units to be transported, the weight of each shipment, and special instructions for delivery. In the section labeled "KIND OF PACKAGES, DESCRIPTION OF ARTICLES SPECIAL MARKS EXCEPTIONS" the freight is designated as "Drugs or Medicines Non Hazardous." The freight is labeled "Item 60000 Class 85, RVNX $2.40." Neither of the latter terms is defined in the bills of lading.

The bills of lading contain the following "certification" language:

> Carrier, SFRI . . . RECEIVED, *subject to the classifications and Tariff, in effect on the date of issue of this bill of lading . . .* The Proper[sic] described below, in apparent good order, . . . which said carrier . . . agrees to carry . . . that every service to be performed here-under shall be subject to all terms and conditions of the Uniform Domestic Straight Bill of Lading . . . in the applicable motor carrier classification or tariff if this is a motor carrier shipment. *Shipper hereby certifies that he is familiar with all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment and the terms and conditions are hereby agreed to by shipper and accepted by himself and his assigns.*

(Emphases added). The bills of lading also have a "declared value" box:

> NOTE—Where the rate is depend[e]nt on value, shippers are required to state specifically in writing the agree[d] or declared value of property. The agreed or declared value on the property is hereby specifically stated by the shipper not to be not exceeding ____per ____.

No value is declared on the bills of lading.

"RVNX" is not defined in the bills of lading. According to SRT, RVNX is an abbreviation for "Released Value Not to Exceed"—it is a per pound limit of liability for any claim against the carrier related to the loss or damage of the cargo, calculated by multiplying the per-pound limit of liability by the weight in pounds of the cargo.

*Id.* at 143–144 (alterations and mistakes in original; footnotes omitted).

SRT thus understood the label "ITEM 60000 CLASS 85" to refer to a "category of freight." *Id.* at 151. And it understood the letters "RVNX" "to designate a per pound limit of liability of any claim against the carrier in the event that the cargo is lost or damaged in transit." *Id.*

Exel had a different understanding. According to Exel, "RVNX" was simply "a freight classification which ha[d] been programmed into Exel's computer." *Id.* Exel later pointed to the fact that "[t]here [was] no declaration of the value of the property" in the bills of lading (which, as noted above, required the shipper to declare a value for the shipment if the rate depended on value). *Id.* In Exel's view, this omission showed that the "bills of lading are merely freight receipts and not evidence of a written agreement to limit liability between Sandoz and SRT." *Id.* Exel maintained, in other words, that it left blank the spaces in the bills of lading for declaring the shipment's value because the parties had negotiated a flat rate, and the bills of lading, by their terms, required the shipper to declare a value for the shipment only if the shipping rate depended on the value of the goods being shipped.

As explained in *Exel I,* the bills of lading's cryptic language soon became important because,

[o]n November 7, 2008, the SRT truck carrying the Sandoz shipment was stolen and the goods were never recovered. On November 14, 2008, Sandoz made a claim for the lost goods with Exel.

The November lost shipment was not the first cargo loss involving Sandoz, Exel, and SRT. Three months prior, on August 24, 2008, a SRT truck carrying Sandoz's cargo was stolen near Memphis, Tennessee, and the goods were never recovered. Exel submitted a written notice of claim to SRT pursuant to the MTSA, seeking full value recovery of the August shipment based on replacement cost for the shipment, which SRT paid (although the amount at issue

was much less). Also after the August 24 theft, SRT allegedly agreed to assign Sandoz–Exel shipments to SRT's Constant Security Program (CSP), which requires that a truck never be left unattended. Exel admits that neither Exel nor Sandoz paid SRT for any special handling under the CSP, but maintains that "SRT apparently chose to absorb the cost of the CSP in order to keep" Exel's business.

Thus, on December 9, 2008, Exel submitted on behalf of Sandoz a claim to SRT pursuant to the MTSA demanding the full replacement [sic] value of the November shipment, $8,583,631.10. This time SRT denied the claim, stating that its recovery was limited to $56,766.36, based on the terms in the bills of lading, namely the "RVNX $2.40", times the weight of the cargo. In a letter dated January 29, 2009, Martin Gargiule, Director of Finance in Business Planning and Analysis Group for Sandoz, reiterated its position that "Sandoz holds Exel fully liable for the Claim, and demands payment for the claim in the amount of $8,585,631.10," and that "Sandoz therefore rejects Exel's position that it is not liable for the loss, or that Sandoz must look to the carrier for recovery."

On October 18, 2010, Sandoz assigned its rights and interests in the second lost cargo to Exel. On November 5, 2010, Exel, "for the use and benefit of" Sandoz, filed a complaint against SRT, . . . [seeking] $8,583,671.12 in damages.

*Id.* at 144–45.

## B.     Procedural background

Sandoz assigned its interest in the lost shipment to Exel shortly before Exel filed this lawsuit. In its complaint, Exel brought claims against SRT for (1) breach of contract, (2) breach of bailment, (3) breach of statutory duties under the Carmack Amendment, and (4) a declaratory judgment as to which document—the MTSA or the bills of lading—governed Exel's claim for damages. After SRT moved for judgment on the pleadings, the district court dismissed Exel's claims for (1) breach of contract, and (2) breach of bailment.

Both parties then moved for summary judgment. The district court granted summary judgment in favor of Exel on its declaratory-judgment claim, holding that the MTSA, rather than the bills of lading, governed Exel's claims for damages. Pursuant to the terms of the MTSA, the court awarded Exel damages in the amount of the replacement cost of the lost goods, which was $5,890,338.82. The court dismissed Exel's claim under the Carmack Amendment, apparently having concluded that it was duplicative.

Both parties appealed. SRT challenged the damages award, arguing that Exel lacked standing to sue under the MTSA because Exel had suffered no direct injury. Exel conditionally appealed the dismissal of its claim under the Carmack Amendment, seeking reinstatement of that claim if the award of damages was overturned.

This court granted partial relief to both parties. It agreed with SRT that Exel lacked standing under the MTSA because Exel had suffered "no injury" under that agreement. *Exel I*, 807 F.3d at 147. The court further held that Exel's only cause of action against SRT, as the assignee of Sandoz's claim, arose under the Carmack Amendment. *Id.* Accordingly, the court vacated the judgment for damages under the MTSA. *Id.* at 148. At the same time, it reinstated Exel's claim (for the use and benefit of Sandoz) under the Carmack Amendment and narrowed the case on remand to a single issue: "whether SRT's liability is effectively limited in the bills of lading." *Id.* at 151, 153–54.

The resolution of that issue, the *Exel I* court said, would turn on the district court's determination of whether SRT had carried its burden on summary judgment of meeting four requirements in order to effectively limit its liability to a shipper under the Carmack Amendment. Those four requirements are that a carrier

> (1) maintain approved tariff rates with the ICC; (2) provide the shipper with a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to its choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

*Id.*

On remand, the parties cross-moved for summary judgment on the sole remaining issue. The district court concluded that SRT had not satisfied the second requirement listed above— that is, SRT had not proved that it provided Exel with a fair opportunity to choose between two or more levels of liability.

This conclusion was driven largely by the district court's factual findings. The court deemed the bills of lading ambiguous because, among other things, the significance of the terms "ITEM 60000 CLASS 85" and "RVNX $2.40" was unclear, especially given that Exel had not declared a value for the shipment despite language requiring it to do so if the rate depended on

value.  This ambiguity led the court to consider parol evidence.  That evidence showed, in turn, that "Exel and SRT negotiated a flat rate" that "did not depend on [the released] value"; that "Sandoz and SRT had no negotiations over rates"; and that "the parties assumed that the MTSA, and not the bills of lading, dictated liability at the time the bills of lading were drafted and signed."  Accordingly, the court determined that the term "RVNX $2.40" in the bills of lading did not constitute a "valid limitation of liability."

In a subsequent order, the district court concluded that the proper measure of damages is the cost that Sandoz incurred to replace the stolen pharmaceuticals, which was $5,890,332.82 plus interest.  The appeal and cross-appeal now before us timely followed.

## II.  ANALYSIS

### A.     Standard of review

We "review[] a grant of summary judgment de novo."  *ACLU of Ky. v. Grayson Cty.*, 591 F.3d 837, 843 (6th Cir. 2010).  Summary judgment is proper when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  All reasonable inferences must be drawn in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The principal inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### B.     SRT bears the burden of proving that Exel agreed to a limitation of SRT's liability.

"The Carmack Amendment, enacted in 1906 as an amendment to the Interstate Commerce Act, 24 Stat. 379, created a national scheme of carrier liability for loss or damages to goods transported in interstate commerce."  *Exel I*, 807 F.3d at 148.  It "restricts carriers' ability to limit their liability for cargo damage" and "makes a motor carrier fully liable for damage to its cargo unless the shipper has agreed to some limitation in writing."  *Id.* (citing 49 U.S.C. § 11706(a) & (c), and § 14101(b)).

"To overcome this default posture of full liability," the carrier "must have a written agreement [with the shipper] that is sufficiently specific to manifest that the shipper in fact agreed to a limitation of liability." *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 142 (4th Cir. 2013). "[A] carrier cannot limit liability by implication. There must be an absolute, deliberate and well-informed choice by the shipper." *Id.* (quoting *Acro Automation Sys. v. Iscont Shipping*, 706 F. Supp. 413, 416 (D. Md. 1989)). Accordingly, the Carmack Amendment "puts the burden on the carrier to demonstrate that the parties had a written agreement to limit the carrier's liability, irrespective [of] whether the shipper drafted the bill of lading." *Id.* at 145. SRT bears this burden here.

**C.     SRT did not carry its burden to show that it effectively limited its liability under the Carmack Amendment.**

Of the four requirements that a carrier must satisfy in order to limit its liability to a shipper under the Carmack Amendment, only the second—that a carrier must "provide the shipper with a fair opportunity to choose between two or more levels of liability," *Exel I*, 807 F.3d at 151—is at issue here. The Supreme Court has made clear that this requirement contemplates not only a choice between levels of liability, but also a choice between rates, such that the rate paid by the shipper varies according to the liability borne by the carrier. "[O]nly by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." *New York, N.H. & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 135 (1953).

In fact, the very purpose of the requirement that the carrier provide the shipper with a choice between levels of liability is to allow the shipper to "obtain[] the lower of two or more rates of charges proportioned to the amount of the risk." *Adams Express Co. v. Croninger*, 226 U.S. 491, 509–10 (1913) (explaining the requirement's rationale at common law).

This court has explained the requirement's purpose as follows:

> If . . . a carrier receives authorization for a tariff that includes a shipping rate limiting its liability for lost or damaged goods to the value established by the shipper (called the "released value" of the goods), and the shipper is willing to limit the carrier's liability to a value lower than the actual worth of the goods, the

carrier will be in a position to shift some of the risk of loss of the goods back to the shipper. *In exchange for agreeing to this lower released valuation, the shipper can expect to enjoy a lower shipping cost.* The shipper is not required to accept the lower shipping rate and share the risk of loss; instead, it can select a higher rate, thus placing the risk of loss on the carrier.

*Toledo Ticket Co. v. Roadway Express, Inc.*, 133 F.3d 439, 441–42 (6th Cir. 1998) (emphasis added). The rationale for the requirement would be frustrated if a carrier were permitted to enjoy the benefit of limited liability without the shipper enjoying a corresponding discount.

In the present case, the district court found that Exel and SRT "negotiated a flat rate" and that the "rate for the . . . shipment did not depend on [the shipment's] value." This finding is supported by two key pieces of evidence. First, when Exel requested price information from SRT, it requested a "rate per mile" or a "flat rate." Second, the bills of lading for the stolen shipment provide: "Where the rate is depend[e]nt on value, shippers are required to state specifically in writing the agree[d] or declared value of property." Exel did not state any agreed or declared value, indicating that the rate was not dependent on value. Based on this evidence, and because no evidence suggests that the rate paid by Exel varied with the shipment's value, the district court's finding that the parties had negotiated a flat rate is not clearly erroneous.

On appeal, SRT does not dispute the district court's finding that SRT charged Exel a flat rate. SRT instead asserts that it would have declined to carry the shipment altogether if it had known its value—the implication being that the rate *did* depend on the shipment's value in the sense that SRT would not have offered *any* rate to carry such a valuable shipment. To support this assertion, SRT points to Exel's representation in its initial pricing inquiry that the value of Exel's shipments would "typically" be $1 million or less. SRT also points to the deposition testimony of its director of pricing, Rodney Danley, who testified that SRT "would not have handled" the stolen shipment if it had known its true value.

But SRT's assertion that it would not have knowingly carried such a valuable shipment is unpersuasive. If SRT had wished to exclude such high-value cargo from its business, it presumably could have done so. SRT, however, did not follow that route. It instead agreed with Exel to ship the goods at a rate not dependent on their value without inquiring into what that value was. This decision by SRT did not excuse it from the requirement that it provide the

shipper with a fair opportunity to choose between two or more levels of liability in exchange for a corresponding adjustment in rate. Embracing SRT's argument that a shipper can be required to choose between accepting a single rate-and-liability offering or finding a different carrier altogether to transport its goods would eviscerate the Carmack Amendment's opportunity-to-choose requirement.

And to the extent that SRT claims any reliance on Exel's representation in "a 'Truckload Pricing Request' . . . that the value of the Sandoz cargo transported by SRT would be 'typically $1 Million or less,'" we note that *typically* is an important qualifier and that SRT did not inquire about the value of the particular shipment at issue here. Nor did SRT give Exel any notice that it would decline to carry goods worth more than those that Sandoz typically shipped.

SRT next argues that the opportunity-to-choose requirement is satisfied as a matter of law whenever the documents that might limit the carrier's liability (in this case, the bills of lading) were drafted by the shipper. The logic of this argument is that a shipper who drafts the liability-limiting documents has full freedom to determine the carrier's level of liability, so the carrier need not provide the shipper with a menu of options.

To be sure, "the fact that the shipper drafted the bills of lading is relevant in ascertaining whether the shipper was offered, and agreed to, a limitation of liability by the carrier." *Exel I*, 807 F.3d at 153. But that fact is "not dispositive." *Id.*; *accord ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 142 (4th Cir. 2013) ("The text of the Carmack Amendment imposes full liability on carriers, without regard to which party prepared the bill of lading."). And critically, "[t]he general contract principle that ambiguous contracts be construed against the drafter is inapplicable in the face of statutory language that unambiguously imposes the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper." *Id.* at 145 (internal citation omitted).

None of the cases cited by SRT supports its position that, when a shipper drafts the bills of lading, the carrier is excused from the requirement to give the shipper a choice between two or more levels of liability. The cases cited by SRT—besides being nonbinding—are distinguishable because the shippers in those cases in fact paid a lower rate as a benefit of having

chosen a lower level of carrier liability.  *See Werner Enters., Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1328 (11th Cir. 2009) ("The manifest itself did not need to include the choice of levels of liability and rates; that choice was provided in a separate written contract, and Transpro chose not to increase the liability for this shipment . . . ."); *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1273 (11th Cir. 2001) ("Siren knew 'Class 85' determined the freight rate charged, and Siren knew that it received a 62% discount from Estes' full freight rate."); *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 612–13 (9th Cir. 1992) (finding that the shipper received discounted rates "in return for the lower release value"); *Am. Cyanamid Co. v. New Penn Motor Express, Inc.*, 979 F.2d 310, 311 (3d Cir. 1992) (noting that, under the bill of lading's "'released value' clause," the transportation charges varied according to the level of carrier liability selected by the shipper); *Mech. Tech. Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1090 (2d Cir. 1985) (Winter, J., concurring) ("MTI's failure to complete the bill of lading led to its paying the lowest freight rate.  I would hold MTI to the limitation of liability that corresponds to the rate paid.").

Accordingly, the carriers in those cases complied with the rule that "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier limit recovery to an amount less than the actual loss sustained." *See New York, N.H. & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 134 (1953).  The same is not true here because Exel received no discount by including liability-limiting language in the bills of lading.

Because we conclude that SRT failed to satisfy the opportunity-to-choose requirement, we do not reach the question of whether the value to which the bills of lading limited SRT's liability would be "reasonable under the circumstances surrounding the transportation," as required by 49 U.S.C. § 14706(c)(1)(A).  Nor do we have any need to consider Exel's fallback argument that the "material-deviation doctrine" (a doctrine from admiralty law that this court has never applied in the context of the Carmack Amendment) negates any otherwise-valid limitation of liability because SRT breached its promise to not leave its truck unattended.

**D.** **The district court did not err in measuring Exel's damages by the stolen goods' replacement cost rather than by their market value.**

In its cross-appeal, Exel argues that the district court erred in measuring Exel's damages by the replacement cost of the pharmaceuticals rather than by their market value, which was considerably higher. The Carmack Amendment allows shippers to recover damages for "actual loss or injury to the property." 49 U.S.C. § 14706(a)(1). Here, the court measured Exel's "actual loss or injury" by the pharmaceuticals' replacement cost based on the finding that Sandoz successfully provided a substitute shipment to its customer and did not lose any sales.

To begin with, Exel points out that "courts have generally held that 'full actual loss' under [the statute] is equivalent to market value at destination." *See Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir. 1973) (per curium). This general statement, however, has little bearing on any individual case because how the shipper's loss should be measured depends on the circumstances. *See Ill. Cent. R. Co. v. Crail*, 281 U.S. 57, 64 (1930) ("The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable."); *U.S. v. Palmer & Parker Co.*, 61 F.2d 455, 459 (1st Cir. 1932) ("[T]he market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts.").

Moreover, courts have recognized that "[r]eplacement cost is an appropriate measure of damages where the injured party could mitigate the loss by replacing the goods." *Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1120 (9th Cir. 2000); *see also Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990) (concluding "that the magistrate properly computed the damages using the replacement cost figure" because the plaintiff "secured substitute goods after the accident, lost no sales, and had no opportunity for a sale with these damaged goods," so its "'actual loss was obviously the cost of replacing the damaged merchandise'" (quoting *Meletio Sea Food Co., Inc. v. Gordons Transps., Inc.*, 191 S.W.2d 983, 986 (Mo. App. 1946))).

But Exel points out that, although it bears the ultimate burden of proving damages, several courts have "held that the burden of proving that the market value rule will not result in a

just measure of actual damage is on the carrier." *See Great Atl. & Pac. Tea Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 333 F.2d 705, 708 (7th Cir. 1964) (citing *Reider v. Thompson*, 197 F.2d 158, 160 (5th Cir. 1952)); *Robert Burton Assocs., Inc. v. Preston Trucking Co., Inc.*, 149 F.3d 218, 221 (3d Cir. 1998) ("[T]he carrier has the burden of proof to demonstrate that a court should deviate from the market value rule.").

Here, the district court agreed with Exel's view that SRT bore the burden of proving that damages should be calculated based on replacement cost rather than market value, so Exel cannot complain that the court applied the wrong standard. This leaves Exel to argue that SRT simply failed to carry its burden—an argument that turns on the facts.

The evidence shows that Sandoz successfully replaced the stolen shipment and did not lose any sales. In the parties' final pretrial statement, which they filed jointly, they listed as an "Uncontroverted Fact[]" that "Sandoz provided McKesson with a subsequent shipment to replace the stolen shipment." And a director of finance at Sandoz, Martin Gargiule, testified in his deposition that the company's customer-service "report cards" do not attribute any lost sales to the stolen shipment. This is strong, direct evidence that the theft did not cause Sandoz to lose any sales.

In contrast, the evidence cited by Exel for its assertion that Sandoz did lose sales is weak. Exel points to deposition testimony by Gargiule that purportedly establishes that Sandoz had a "continual stream of additional orders that come in on the next day, and the next day, and the next day after that" (counsel's words in briefing). But Exel overstates the case. Gargiule in fact made an ambiguous statement regarding Sandoz's supply chain that the district court determined was not "evidence that Sandoz lost any sales; it's just a description of a company's supply chain."

Moreover, the cases that Exel cites in asserting that market value is the appropriate measure of damages here are distinguishable. In *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 350–51 (1st Cir. 1973) (per curium), the shipper presented "detailed proof" that the stolen goods were in "great demand." The shipper was also "the sole manufacturer of the types of products lost," which meant that, if the goods had not been stolen and shunted into the black

market, "all the purchasers of the hijacked goods would have had to purchase them from [the shipper]" instead. *Id.* at 351. No equivalent facts exist here.

The case of *Robert Burton Associates, Inc. v. Preston Trucking Co., Inc.*, 149 F.3d 218 (3d Cir. 1998), is distinguishable for similar reasons. Although the shipper in that case successfully replaced the lost shipment, evidence showed that the stolen goods "were flooding the market 'at significantly reduced prices,'" causing "a drastic decline" in the shipper's sales. *Id.* at 220. No such proof is in the record here.

The final case that Exel relies upon, *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317 (10th Cir. 1991), is distinguishable because the shipper in that case was a volume seller, and the carrier's evidence that the shipper lost no sales was relatively weak. In *Eastman Kodak*, the shipper "produced evidence that it [sold] virtually all of its . . . merchandise shortly after production [was] completed." *Id.* at 319. The carrier "failed to offer evidence to rebut [that] claim." *Id.* at 320. Moreover, the only evidence suggesting that the shipper did not lose any sales was the carrier's affidavit. *Id.* at 319.

In the present case, by contrast, there is no evidence—apart from Gargiule's ambiguous testimony discussed above, which the district court properly discounted—that the shipper is a volume seller. And the shipper's own customer-service records suggest that the shipper did not lose any sales.

We therefore conclude that the court did not err in measuring Exel's damages by the replacement cost of the pharmaceuticals. Measuring Exel's damages by the pharmaceuticals' market value would give Exel a windfall. *See Robert Burton*, 149 F.3d at 221 (recognizing that an "unjustified windfall" would result from "awarding [the shipper] the invoice price" of the lost goods if that loss "did not cause [the shipper] any loss of sales").

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.